Nott, J.,
delivered tbe opinion of tbe court:
It is a fundamental principle of landlord and tenant law that a tenant bolding over after tbe expiration of bis term, amid circumstances wbicb import a continuance of tbe relation of landlord and tenant, continues to bold upon tbe conditions of tbe lease and to be liable for sucb rent as it reserves. In some cases a holding over may constitute a tenancy at sufferance; in others, a tenancy at will or from year to year; but; in all cases tbe landlord may recover at tbe agreed rate (Cobb v. Stokes, 8 East, 358), either as rent (Ibbs v. Richardson, 9 Ad. & El., 849) or for use and occupation (Christy v. Tancred, 7 Mees. & Wels., 127); and tbe tenant, unlike tbe landlord, has no election to say whether be shall betreatedas a tenant or as a trespasser (Conway v. Starkweather, 1 Denio, 113), and is without power to throw off tbe character of tenant, however onerous it may be (Scuhyler v. Smith, 51 N. Y., 309.)
But in tbe case now before the court there was no “ holding over ” in tbe ordinary sense of these words, because there was no term certain named in tbe lease. In its own words, tbe term was to begin “ on tbe 1st day of January, 1865, and continue from month to month during tbe pleasure of tbe United States.” No time was fixed when tbe term should end, and no notice was necessary to terminate tbe lease. Tbe only limitation set upon tbe lessees was that wbicb a fair construction of tbe words “ from month to month” implies, viz, that they should terminate tbe lease at tbe end of a month; and tbe onl y thing wbicb they bad to do then to relieve themselves from tbe further payment of rent was to vacate tbe premises. Conversely, tbe only thing which they'could do as a matter of right, to escape from liability for rent, was to restore possession of tbe premises to' their lessors. Tbe notice, therefore, given by tbe quartermaster on tbe 25th September was entirely voluntary; it was not required by tbe lease •, it was not contemplated by tbe parties; it secured no new right for tbe one, and it imposed, per se, no new obligation upon tbe other.
Nevertheless, tbe counsel for tbe defendants has raised two objections, tbe one going to tbe right of a recovery, and tbe other to a reduction of tbe amount claimed.
It is said that tbe notice of September 25, followed by tbe silence of tbe lessors, constituted a license to tbe defendants to *327 leave their buildings upon the premises after vacating them, and to remove them after the termination of the lease; and that this license would continue, if not at the pleasure of the lessees, certainly until it should be terminated by a proper notice from the lessors.
A permission to occupy and enjoy premises for an indefinite period free from rent is properly a tenancy at will, and not a license. But, as the theory of the defendants’ officers was that they did not occupy and enjoy the premises as they previously had been doing, but merely reserved a right to go upon the premises and remove the defendants’ buildings when they should deem it best, we may treat the question upon that assumption.
A license is an authority to do a particular act, or series of acts, upon the land of another, without possessing an estate therein. When executed, it will prevent the owner of the land from maintaining an action for the acts done under it; but it is revocable at pleasure, and will not be a defense for an act done after revocation. A consideration may have been given for it or expenditures made strictly on the faith of it, yet the owner of the land may revoke it when he will (unless it be coupled with a,n interest) without paying back the money or making compensation for the expenditure. (Wood v. Leadbitter, 13 Mees. & Wels. 838; Wolfe v. Frost, 4 Sand. Ch. 72; Selden v. Delaware & Hudson Canal Co., 29 N. Y., 639; Jamieson v. Millemann, 3 Duer 255.)
Inoperative at the common law for the want of a seal, and void under the statute of frauds because not in writing, a license, when without consideration, is also somewhat like a gift inter vivos, which is clearly dependent on the intent of the donor, must be accompanied by delivery, and, if it be continuing (such as an annuity), is subject at any moment to revocation. In this case it is manifest that when the lessors presented a claim on the 21st February, 1866, for rent subsequent to the month of September, 1865, a continuance of the license (if any can be inferred from the previous acts of the parties) was at an end; and it clearly became the duty of the defendants’ officers to vacate the premises immediately, and stand upon the license which the defendants now claim. Instead of doing so, they, on the contrary, made no mention of a permission of the lessors, continued the status of their occupancy, whatever it was, and insisted upon it as a matter of right. It is clear, therefore, that nothing in *328 tbe nature of a license existed, or was understood by either-party to exist, after, say, the 1st March, 1866.
But was anything in the nature of a license ever understood, to exist by either party?
As has been said, a license is in the nature of a permission-granted by the one party and acted' upon by the other; and it-is strictly a matter of favor, and in no sense a matter of .right. The defendants’ notice of September 25, out of which the license sprang, if one can be inferred, declared to the lessors (1). that the premises would be vacated on the 30th instant; (2) that the -rent would cease from that date; (3) that the government “reserves the right to sell or-otherwise dispose of” the buildings which had been erected on the premises. The notice, therefore, did not crave a privilege; on the contrary, it in express words “ reserved a right,” and no two words could -have been chosen more thoroughly antagonistic to the nature of a license. To “reserve” was to retain something which the defendants already possessed; a “right” in the premises was in no sense a favor dependent upon the will of the other party, and was directly opposed to the very definition of a license.
Ordinarily, every transaction between men in the nature of a contract must be supported by a consideration. But in the cases of a gift delivered and of a license executed the law makes an exception. The exception is not an arbitrary rule, but-is founded upon the plain and just principle that, with regard to transactions passed or performed, a man shall not be permitted to change his attitude so as to force his neighbor into-an implied contract of bargain and sale which he never intended to make, or into the purchase of an easement which he never-intended to rent. Hence the donee or licensee must always be-in a position to say that he acted upon the faith of the gratuitous nature of the transaction, that he accepted the gift because it was a gift, or used the license because it was a license.
Now, what is there in the facts of this case to show that on and after the 1st October, 1865, the lessors accorded a permission to the lessee to continue to use the premises rent free, or that the defendants’ officers continued their user upon the faith of any such license?
It is true that the license may be implied, for the law will not allow a man to delude another by his silence any more than by his utterances. Here the only thing that passed between the- *329 parties was tbe notice of September 25th. Did it cast upon the lessors an equitable obligation to' speak, or do its terms imply that if the lessors had spoken then the defendants’ officers would have done otherwise than as they did ? In other words, were the lessors bound to infer from the terms of the notice that if they had said on the 25th September, “We accord you nolicense of continued occupancy wherein to remove your buildings,” the chief quartermaster would really have vacated the premises and restored them to the lessors on the 1st October %
The premises at the time the notice was given must have been well-nigh covered by the platform-wharf and buildings of the defendants. The platform was about 40 feet by 150. Of the eighteen buildings on the premises, eight of them were each more than 100 feet in length; and all of the others, with one exception, were each more than 50 feet in length. Manifestly, these buildings could not have been removed by the 1st October; manifestly, the lessors could not have been restored to anything like a substantial occupancy of the premises so long as the buildings and wharf remained there. The chief quartermaster did not intend to abandon them as fixtures, and did intend to-retain an indisputable occupancy in the premises until the buildings should be sold or otherwise disposed of. No reserved right to remove these buildings being secured to the lessee by the terms of the lease, he may have supposed that if the lease were terminated on the 1st October and the premises voluntarily abandoned to the lessors, the buildings would pass absolutely to them with the realty.
- On these facts there is not the slighest ground for inferring that the lessors granted a license to the lessee or that the defendants’ officers acted on the faith of one. The notice of September 25th undoubtedly meant, and was undoubtedly understood by both parties to mean, that the chief quartermaster would not pay rent after he should cease to use the premises for the business purposes of the Quartermaster Department; that the buildings which the department had erected on the premises would not be abandoned to the lessors; and that the government intended in any event to reserve a right of occupancy in the premises for whatever period might be necessary to secure the sale and removal of the buildings. And the notice was apparently given by the one side and accepted by the other in the common mistake of law, that when the business user of *330 the premises by the department should cease, the government would not be liable for rent, except at the pleasure of its officers. No such mistake of law could operate to discharge the liabilities of the one party or destroy the rights of the other. Possession was retained by the defendants’ officers as a right, and the only right which the government possessed in the premises was under the lease. We must therefore conlude, as a matter of law, that on the 1st October the defendants had acquired nothing in the nature of a license from their lessors, but had elected to continue .their occupancy upon the terms and conditions of their lease.
How long did this occupancy continue, and was there anything from which the court may infer that it ceased before the final removal of the lessors on the 1st July?
On the 21st February, as has been said, the lessors presented a claim for rent to the proper officer, the chief quartermaster of the depot. In this communication they referred to the notice of September 25th, averred that the buildings were not sold till November 3d, and that ten days was given by the terms of sale to purchasers wherein to remove them; and concluded that for these purposes the government had “ retained, the occupancy of the premises from October 1 to November 13,” and should pay rent for that period. It may be conceded that this communication is evidence prima facie to show that possession was restored to the lessors on .the 13th November. It may also be conceded that if this claim so presented had been accepted and paid, it should be treated as the compromise of a disputable demand, and be held to discharge the defendants from further liability. But as evidence the paper is nothing more than prima facie, for it contains no express admission; and as the compromise of an ■existing right it is inoperative, for the proffered demand was rejected by the department. It negatived from the time it was presented any theory of a license, if any such theory had existed, and it notified the officers of the department that for at least a portion of the occupancy subsequent to October 1 the lessors maintained the continuauce of the lease and demanded the payment of its rent.
If the responsible officer of the defendants, the chief quartermaster of the depot of Washington, had acted promptly upon this claim of the lessors and had done nothing more, we should be inclined to hold that he had been misled by the silence of *331 tbe claimants, and that his continued occupancy was unintentional; for their letter said nothing about the continued presence of a watchman on the premises, nor of the existence there of the platform or wharf. But the chief quartermaster did not reject their demand until the 14th June, while on the 30th May he had given notice of the sale of the platform, and during the entire time was maintaining a watchman on the premises who forbade vessels to land there, and excluded the lessors from the use of the premises. We are forced, therefore, to the conclusion that the officer in official charge of the premises acted with knowledge of the principal facts, though in a mistaken view of the legal obligations of the government; that he retained possession by virtue of the lease to the exclusion of the lessors; and that the lease continued legally operative until the 1st July, 1866.
After the possession had been restored to the lessors, they pressed upon the Treasury Department the same claim which they had presented to the chief quartermaster of the depot and supported it by an affidavit. The affidavit, like the letter to the chief quartermaster, shows an absolute, unqualified occupancy by the government up to the 13th November, and, like the letter, is silent as to an actual or continued occupancy subsequent to that date. As this affidavit was not presented until after the rights of the parties, whatever they were, were fixed, it could not have misled the defendants in any way; and as the claim which it supported was rejected by the Treasury, it cannot furnish a basis for an implied settlement or compromise. It is at best evidence as an admission of the party, and by its terms is nothing more than evidence prima facie. Upon no legal principle can it exclude the other evidence in the case, which establishes the fact that the lessors were kept from the use and enjoyment of the demised premises until the 1st July, 1866.
An objection is raised by the defendants’ counsel as to the claimants’ right to maintain this action for the use of their assignees. But we are all agreed that if the assignment of this claim for the benefit of their creditors was void under the decisions in Gillis v. The United States (95 U. S. 407), and Spofford v. Kirk et al. (present term), the right of action remained in the assignors; and that if the claim passed as one of the excepted assignments referred to by the Supreme Court, the *332 assignees may maintain an action upon it in the name of theix assignors.
The judgment of the court is that the claimants recover of the defendants the sum of $2,250.
Drake, Oh. J., and Bichaedson, J., dissented.