Nott, J.,
delivered the opinion of the court:
This case, which has been twice argued, has twice presented some of the most perplexing questions of constitutional and international law, and of the conflicting rights of the government as a sovereign and as a contracting party, that have been before the court for many years. A closer analysis of the facts, however, has separated the relevant from the irrelevant, and so simplified the ultimate questions to be determined that the court is now able to reach its conclusions with a sense of tolerable certainty, if not of absolute freedom from doubt.
The controversy arises entirely from the cross-action of the defendants, who seek to recover for the building of certain railroad bridges in Missouri in 1864-65. On the part of the government it is maintained that the destruction of those bridges was an act of war and the rebuilding of them a matter of contract ; that no liability having been incurred for an act performed' for the public defence, and the bridges having been rebuilt with the claimants’ knowledge, under their tacit permission, and for their immediate use and benefit, the law implies a contract to pay the fair value of the service so rendered. This is good law, *209 and if properly applicable to tbe facts of tbe case leads to an inevitable conclusion.
On tbe part of tbe claimants it is maintained that the bridges were rebuilt for military purposes, tbe reconstruction being, like tbe destruction of them, a matter of public defense; that the government was morally and equitably, if not legally, bound to rebuild where it bad destroyed; that tbe claimants never requested tbe rebuilding and never authorized it, tbe government avowedly rebuilding for its own uses and purposes, without regard to any supposed agreement or consent; and that tbe law will not imply a contract where tbe plaintiff’s acts negative one. This also is good law, and if it covers tbe whole of tbe case likewise leads to an inevitable conclusion.
Viewed from tbe standing place of either counsel, tbe problem is easy of solution. Its difficulty lies partly in tbe fact that tbe premises of each party do not cover tbe entire ground, but chiefly in the perplexity of finding the right analogy of municipal law where one of tbe parties to tbe alleged implied contract comes into court in tbe duplex character of belligerent and contractor, and where questions of Constitutionalrigbt and military necessity intermingle with questions of voluntary agreement.
There are numerous cases in the books illustrative of this chapter of tbe law of implied contracts; but generally they may be resolved into questions of- license or of trespass. If one man goes upon tbe land of another under a license, express or implied, and does work beneficial to tbe owner, with bis knowledge and assent and in tbe reasonable expectation of being paid for it, tbe law imputes to tbe owner both consent and request, and therefrom implies a contract. But if a man goes upon tbe land of another in tbe character of a trespasser, asking no license, seeking no remuneration, and intent only upon bis own purpose, be cannot- subsequently assume tbe character of a contractor, but must leave tbe fruit of bis labor, whatever it is, behind him, and it inures to the benefit of tbe owner. If tbe government bad been an ordinary bridge-builder, going about tbe country seeking work for gain, and tbe railroad company bad stood by acquiescing in and profiting by those services, tbe defendants’ demand would fall within tbe first class and tbe claimants be liable upon tbe counter-claim. And conversely, if nothing bad passed between tbe parties looking like *210 assent, but the government had gone upon the land of the claimants without their knowledge or against their protest and rebuilt these bridges for its own military purposes, giving no> notice, asking no co-operation, the facts would negative the implied request which the defendants allege, and nothing could be recovered for the work which they did in their own wrong, though the user and the benefit inured entirely to the claimants.
But the case has facts which forbid that it should be assigned to either class, and the question of difficulty is what legal obligation should be deduced from the peculiar and unprecedented circumstances and conditions which involve it. In dealing with that question the court has reached the following conclusions: ■
1. The conference held by General Rosecrans with the presi-dentandsome of the directors of the companymaynot havebeen effective as a matter of contract, but was effective as a matter of notice. It is true that the charter of the companyplaced the control and management in a board of directors, and that the board was the one controlling authority of the company; yet, nevertheless, bodies corporate are operated by agents, and, like other principals, their responsibility is measured by the law of agency. No man when he brings an action against a corporation is bound to get together the directors and serve a writ upon the assembled board. No man who has a notice to give is obliged to await the meetings of the directors and make the notification personal to them. The laborer who renders his service, the tradesman who delivers his goods to a body corporate through the proper channel of its proper executive officers, cannot be defeated, when seeking his just compensation, by the usual provision in the charter that the affairs of the corporation shall be managed by a board of directors. In this case, if the action of the board was needful either to permit or forbid the rebuilding of the bridges, it was the business of the president and superintendent, and not the business of General Rosecrans, to summon the board and bring before them the proposed action of the government.
We therefore regard the conference, which was never disavowed by the board of directors, as being to all intents and purposes a conference in which the corporation, through their executive officers, were in law as in fact participants. We *211 agree that the board might, within a reasonable time, have disavowed the presence of their officers and notified the government of the company’s determination not to permit the rebuilding of the bridges, but we are satisfied, both by the silence of the directors and by the subsequent action and co-operation of the company, that the proposals and notice of General Bose-crans were as effective as if they had been addressed in writing and delivered directly to the board.
The rights and liabilities of the parties, therefore, must be measured and ascertained with reference to the representations and assurances which were mutually given to each other at that conference.
2. In matters of contract the parties stand upon an equal footing, and it is essential to the existence of an express contract that there be that mutual consent and agreement which courts have called “ the meeting of minds.” Where there is no consent there is no contract. But there are other transactions among men wherein they do not stand upon an equal footing, and wherein one may dictate terms to the other. If a debtor owe two debts to the same creditor, he may designate at the time of payment upon which the money shall be applied, and the creditor cannot aver that, on the contrary, if it be paid he shall apply it otherwise. If he takes the money he will take it, no matter what he may say, upon the terms prescribed by him who pays it.
So when a man seeks a license to go upon theland of another, it is for the owner to prescribe the terms; and whenever the terms of the license can be ascertained they measure the rights of the one party and the liabilities of the other. What General Bosecrans said he would do or would not do was immaterial, for it did not lie in the mouth of the government, as a would-be contracting party, to dictate terms to the owners of the property under whom and to whom they, sought to render a contractor’s service. On the contrary, the railroad company, as owners of the land had the legal right to limit the terms of their consent; and when they exercised that right, prior to the rendering of the service, they set bounds to their own liability and imposed conditions upon the government. Those conditions limited its future right to remuneration.
“A license is an authority to do a particular act or series of acts upon the land of another, without possessing an estate *212 therein”; “and it is strictly a matter of favor, and in no sense a matter of right.” (Morgan & Rhinehart’s Case, 14 C. Cls. R., 319.)
The license which was accorded to the government through General Eosecrans was in substance this: That the government might go upon the laud of the company and do all things needful for its military purposes and the public defense, but upon condition, nevertheless, that those bridges which had been destroyed by the order of its own military authorities should be rebuilt at the cost of the United States. We are not unmindful that General Eosecrans said in reply that he would subsequently investigate the matter and determine the right of it according to law and justice; but it is clear, we think, that the representatives of the company stood fast in their position, maintaining always that such bridges as had been destroyed by the proper military authorities of the United States ought to be and must be rebuilt at the cost of the United States, and that for them the company would not be accountable; conceding at the same time that bridges which had been destroyed by the ^public enemy might be rebuilt by the government at the cost of the company.
3. If the case stood exclusively upon the conference with General Eosecrans, the license there accorded would measure the responsibility of the company, am i the defendants here would be entitled to recover only for the two bridges across the Mara-mec; but it appears that the government did not act immediately under that license, and that, so far as the main line of the road was. involved, the license was modified and enlarged by the letter of November 1, 1864, from the president of the company to the chief quartermaster of the department. When that letter is construed in the light of the previous and then continuingarrangement, it meant, we think, that as to the southwestern branch of the road the designated terms and conditions of the license should continue unchanged, but that as to the main line the license should be enlarged to this extent: That if the government would rebuild the bridge across the Osage at its own cost, it should be reimbursed for any other which it might rebuild upon the main line. The government thereupon proceeded to rebuild the bridge across the Osage almost immediately after that letter was sent; and, nothing to the contrary be- *213 iug shown, it mast be inferred that the government acted upon the faith thereof.
In this plight the evidence leaves the case so far as notice, consent, license, and agreement are involved. The government proceeded to rebuild the bridge over the Osage and the company to rebuild the bridge over the Moreau, both of which had been destroyed by the military authorities of the United States. But when the latter was nearly completed by the company it was carried away by a freshet, after which it was rebuilt by the government. Nothing is before the court to show what correspondence, request, representation, or arrangement led to that result. We must therefore conclude that the service of the government was rendered under the modified arrangement above described, viz, that if, the government would rebuild the one bridge the company should rebuild the other. The company having failed to carry out its part of the agreement, it must be inferred that the government acted at its request and on its behalf, and should recover for the rebuilding of the bridge over the Moreau.
The judgment of the court is that, the claimants being entitled to recover on their cause of action $130,196.98 and the defendants being entitled to recover on their counter-claim $85,396.24, judgment be entered in favor of the claimants for the balance, to wit, the sum of $44,800.74.