## PRICE *v.* FORREST.

ERROR TO THE COURT OF ERRORS AND APPEALS OF THE STATE OF NEW JERSEY.

No. 105. Argued January 3, 4, 1899. — Decided March 6, 1899.

In 1850 Price, a purser in the Navy and fiscal agent for that Department, advanced $75,000 to the Government, from his private fortune, to meet emergencies. His right to receive it back was questioned, and was not settled until 1891, when Congress passed an act directing the Secretary of the Treasury to adjust his account " on principles of equity and justice," and to pay to him " or to his heirs " the sum found due him on such adjustment. It was adjusted by the Secretary, and in August, 1892, it was decided that there was due to Price from the United States $76,204.08. Meanwhile Forrest had recovered in the courts of New Jersey, of which Price was a citizen and resident, a judgment against him for $17,000. Forrest died in 1860 without having collected the amount of this judgment. In 1874 his widow, having been appointed administratrix of his

estate, caused the judgment to be revived by writ of *scire facias* and asked for the appointment of a receiver. Price appeared and answered, and then the cause slept until August, 1892, when Mrs. Forrest filed a petition, stating that money was about to be paid to Price by the United States on his claim, and asking for the appointment of a receiver of the Treasury draft, and that Price be ordered to endorse it to the receiver, to the end that the amount might be received by him as an officer of the court and disposed of according to law. A receiver was appointed, gave bond and entered on his duties. Price died in 1894. He left no will. No letters of administration were granted, but the New Jersey court appointed an administrator *ad prosequendum.* The bill in this case was then filed. The relief sought was, the revival of the bill of 1874, that the administrator *ad prosequendum* be made a party, and that the other parties be enjoined from receiving the money from the Treasury, and that the receiver be authorized to receive and dispose of it under the orders of the court. The heirs of Price set up their claims to it. The court held that the plaintiffs were entitled to the moneys in the Treasury and its judgment was affirmed by the highest court in the State. *Held,* that the receiver, and not the heir, was the person entitled to recover the money from the United States; and that the case did not come within the prohibitory provisions against assignments of claims against the United States, contained in Rev. Stat. § 3477.

THE case is stated in the opinion.

*Mr. John C. Fay* and *Mr. Flavel McGhee* for plaintiffs in error.

*Mr. Cortlandt Parker* and *Mr. R. Wayne Parker* for defendants in error. *Mr. Frank W. Hackett* was on their brief.

MR. JUSTICE HARLAN delivered the opinion of the court.

The ultimate question in this case is whether the plaintiffs in error, as heirs of Rodman M. Price, are entitled to receive from the United States the amount standing to the credit of the deceased on the books of the Treasury, and which represents the balance of a sum found in his lifetime under the authority of a special act of Congress to be due him upon an adjustment of his accounts as a purser in the Navy.

The facts out of which arise the questions of law discussed by counsel are as follows:

In the year 1848 the decedent was assigned to duty on the Pacific Coast in California as purser and fiscal agent of the

United States for the Department of the Navy. He acted in that capacity until about December, 1849, or January, 1850, when he was detached from such service and ordered to transfer all public money and property remaining in his hands to his successor, or to such other disbursing officer of the Navy as might be designated by the commanding officer at the naval station at California, and immediately after such transfer to report at the city of Washington for the purpose of settling his accounts.

A. M. Van Nostrand was his successor, in California, as acting purser in the Navy.

About December 31, 1849, Commodore Jones of the Navy, commanding the United States squadron at San Francisco, directed Van Nostrand to receive from Price all books, papers, office furniture and funds on hand belonging to the purser's department at that city. Thereupon Price turned over to Van Nostrand as acting purser of the Navy at San Francisco, forty-five thousand dollars, that being all the public money remaining in his hands.

Subsequently on the 14th day of January, 1850, and out of his private funds alone, Price advanced to Van Nostrand seventy-five thousand dollars, taking a receipt therefor as follows: "San Francisco, January 14, 1850. Received from Rodman M. Price, purser U. S. Navy, seventy-five thousand dollars, for which I hold myself responsible to the United States Treasury Department, $75,000. (Duplicate.) A. M. Van Nostrand, acting purser." This money was so advanced without the approval and signature of Commodore Jones.

Van Nostrand never returned the $75,000 or any part of it to Price, nor did he account for it to the Government.

Price insisted that the United States should reimburse him for the amount so advanced by him, but the officers of the Government denied its liability to him on that account. In an elaborate opinion, given March 12, 1854, Attorney General Cushing held that, while the appointment of Van Nostrand as acting purser was lawful and valid under the circumstances, the Government could not be charged with the private funds paid to him by Price, although the latter be-

lieved at the time that his advance of money to the former was an accommodation to the Government in the then unsettled condition of California. 6 Opin. Atty. Gen. 357.

Finally, by an act approved February 23, 1891, c. 279, 26 Stat. 1371, entitled "An act for the relief of Rodman M. Price," the Secretary of the Treasury of the United States was "authorized and directed to adjust upon principles of equity and justice the accounts of Rodman M. Price, late purser in the United States Navy and acting navy agent at San Francisco, California, crediting him with the sum paid over to and receipted for by his successor, A. M. Van Nostrand, acting purser, January 14, 1850, and pay to said Rodman M. Price, or his heirs, out of any money in the Treasury not otherwise appropriated, any sum that may be found due him upon such adjustment."

Under the authority conferred by that act the Secretary of the Treasury, in August, 1892, adjusted the accounts of Price; and in that adjustment he was credited with the sum advanced to Van Nostrand, leaving due to him from the Government the sum of $76,204.08, which of course included the above sum of $75,000.

In order that the precise questions to be determined upon this writ of error may be clearly apprehended we must now refer to certain matters occurring in the courts of New Jersey both prior to and shortly after the passage of the above act of February 23, 1891.

In the year 1857 Samuel Forrest recovered in the Supreme Court of New Jersey a judgment against Rodman M. Price for the sum of $17,000 and costs. Execution upon that judgment was returned unsatisfied. Forrest died in 1860 intestate. In 1874 his wife, one of the present defendants in error, was appointed and qualified as administratrix of his estate. In the same year she sued out a writ of *scire facias* to revive the above judgment, and it was revived. In the bill seeking a revivor of the judgment she alleged facts tending to show that Price had an interest in certain lands, and also that he had equitable things in action or other property to the amount of many thousand dollars, exclusive of all claims thereon and

of all exemptions allowed by law, which she had been unable to reach by execution on the above judgment. By that bill the administratrix also prayed discovery from Price of all property, real or personal, whether in possession or action, belonging to him, with full particulars in relation thereto, and that the same under the order of court be appropriated in satisfaction of such judgment; further, that a receiver be appointed in the cause to collect and take charge of the property, money or things in action found to belong to Price, or to which he was in any way entitled, either in law or equity, with power to convert the same into money, and with such other powers as were usually granted to receivers in similar cases; and that Price be enjoined from assigning, transferring or making any other disposition of the real estate and personal property to which he was in anywise entitled and from receiving any moneys then due or to become due to him, except where the same were held in trust or the funds held in trust proceeded from other persons than himself.

The defendants to that bill were Price and his wife and son, the latter being alleged to claim some interest in the property described in the bill. They appeared and filed an answer, Price denying that any part of the properties mentioned in the bill belonged to him, or that he had any interest in them.

After the filing of that answer the cause slept until August 9, 1892, when Mrs. Forrest, as administratrix of the estate of her husband, filed a petition stating that since the filing of her bill of complaint in that cause no payment had been made on the judgment against Price, and that neither she nor her solicitors had been able to find any personalty or real estate belonging to Price by levy upon and sale of which any part of the amount due on the judgment could be obtained; that it had lately come to her knowledge that about $45,000 was about to be paid to Price by officers of the Treasury of the United States as the sum found to be due him by an accounting then lately had between him and the Government; that that sum was to be paid by the delivery to Price or to his attorneys of a draft of the Treasurer of the United States or some other negotiable security made or issued by its financial

officers and drawn payable to his order, the rules of the Department forbidding that it be made payable to the order of any other person or that said sum should be paid in any other way, and that said draft or negotiable security was to be made and the transaction closed on the 15th day of August thereafter; and that if Price obtained said money from the United States he would, unless restrained, put the same beyond the reach of the petitioner. The prayer of the petition was that a receiver of the draft or other negotiable security be appointed, and that Price be ordered and directed immediately on the receipt of such draft or security to endorse the same to the receiver, to the end that the amount thereof might be received by him *as an officer of the court and disposed of according to law.*

On the presentation of the petition with affidavits in its support, the Chancellor on the 8th day of August, 1892, issued a rule returnable at chancery chambers September 12, following, that Price show cause why the prayer of the petition should not be granted, and an injunction issue, and a receiver appointed pursuant to that prayer, which rule further directed that Price should be and was thereby restrained and enjoined from making any indorsement of the draft referred to in the petition.

A duly certified copy of that order, pursuant to directions therein, was served upon Price on the 10th day of August, 1892. Nevertheless, after that date Price received from the Assistant Treasurer of the United States at Washington and without permission of the court collected four several drafts signed by that officer for the respective sums of $2704.08, $13,500, $20,000 and $9000, in all the sum of $45,204.08, leaving in the hands of the United States of the amount due on the settlement of Price's accounts the sum of about $31,000.

On the 10th day of October, 1892, Charles Borcherling was appointed by the Chancery Court receiver in said cause of the property and things in action belonging or due to or held in trust for Price at the time of issuing said executions, or at any time afterwards, and especially of said four drafts, with authority to possess, receive and sue for such property and

things in action and the evidence thereof; and it was made the duty of the receiver to hold such drafts *subject to the further order of the court.* The receiver was required to give bond in the sum of $40,000, conditioned for the faithful discharge of his duties. At the same time Price was ordered to convey and deliver to the receiver all such property and things in action and the evidence thereof, and especially forthwith to endorse and deliver the drafts to him, and he and all agents or attorneys appointed by him were enjoined and restrained from intermeddling with the receiver in regard to said drafts, and ordered, if in possession or control thereof, to deliver them to the receiver with an indorsement to that officer or to the clerk of the court for deposit; provided, the order should be void if the drafts other than the one for $9000 were delivered with Price's indorsement to the clerk, the proceeds to be deposited to the credit of the cause. Price was expressly enjoined from making any indorsement or appropriation of the drafts other than to the receiver or the clerk for deposit.

The receiver gave the required bond, and having entered upon the duties of his office, he caused a copy of the above order to be served upon Price, and demanded compliance with its provisions.

In 1892, the particular day not being stated, the Chancery Court issued an attachment against Price for contempt of court in disobeying the order of August 8, 1892. By an order made May 18, 1894, the court held him to be guilty of such contempt and he was directed to pay to the receiver the sum of $31,704.08 and a fine of $50 and costs, and in default of obedience to that order to be imprisoned in the county jail until it was complied with. 7 Dickinson, (52 N. J. Eq.) 16, 31. Upon appeal to the Court of Errors and Appeals the order of the Chancery Court was affirmed. 8 Dickinson, (53 N. J. Eq.) 693.

It is stated that the balance due on the settlement of Price's accounts, about $31,000, was withheld by the officers of the Government in the belief that there was a counter-claim against Price. But it having been determined to pay such balance, the Chancery Court made another order on the

18th day of May, 1894, by which Price was directed to execute two instruments in writing, which he had been previously required by the court to sign, seal and deliver, one of them consenting that the balance from the Government should be paid to the receiver, such consent to be filed with the Treasurer of the United States, and by the other assigning all his property, real and personal, and all his rights and credits.

These last two orders were served upon Price while he was sick, and he died June 8, 1894, without complying with either of them. So far as was known, he left no will, and no application had been made for the appointment of an administrator of his estate, as in case of intestacy. But letters of administration *ad prosequendum* were granted by the Prerogative Court of New Jersey to Allen L. McDermott.

The present bill was filed in the Chancery Court July 5, 1894, in the name of the administratrix of Samuel Forrest and of the receiver Borcherling. The principal defendants are the children and heirs of Rodman M. Price. The other defendants are John C. Fay and McDermott, the latter as administrator *ad prosequendum.*

That bill alleged that on the 9th day of June, 1894, the defendants executed powers of attorney to the defendant Fay, who was one of the attorneys in the litigation respecting the drafts, authorizing him to apply to the Secretary of the Treasury to pay to them the balance to the credit of Price under the act of February 23, 1891, — they claiming that such balance belongs to his *heirs*, and not to the receiver. It appears from the bill that in addition to the above four drafts, the United States paid to Price and his attorneys the further sum of $9000, reducing the balance apparently on the books of the Treasury under the above settlement to the sum of about $23,000. It was further alleged that the officers of the Treasury Department were desirous of doing right and justice in the premises ; that demand had been made by the receiver upon the Treasurer of the United States for the payment to him of said balance of money, and that the Treasurer neither consented nor refused to do so, but awaited the determination

by some lawful tribunal of the right of the receiver in the premises.

The relief asked was: 1. That the cause commenced by the bill of 1874 be revived, and the administrator *ad prosequendum* be adjudged a proper party thereto. 2. That the defendants, the children and heirs of Rodman M. Price, together with Fay, be perpetually enjoined from making any demand upon or application to the United States or from receiving any part of the money awarded to the deceased then remaining in the Treasury of the United States. 3. That the parties above named be decreed to pay to the plaintiff Borcherling, receiver, to be by him disposed of *under the orders of the court*, any part of the money they might have respectively received or might receive. 4. That the administrator *ad prosequendum*, or any executor or administrator of Price thereafter admitted as defendant in the cause, deliver to the receiver all the property of the deceased, whether in possession or action, which might come to their hands.

The heirs of Price filed pleas asserting their right to the benefit of the act of February 23, 1891. The case was heard upon the bill and pleas, and the pleas were overruled by Chancellor McGill. The defendants were thereupon ordered to answer the bill.

Upon appeal to the Court of Errors and Appeals, the order of the Chancery Court was affirmed, and the cause was remitted to that court with directions to proceed therein according to law. *Price* v. *Forrest*, 9 Dickinson, (54 N. J. Eq.) 669.

The heirs then filed an answer, in which they denied that there was any jurisdiction in the Chancery Court to sequester the moneys in dispute in the Treasury of the United States, and insisted that whatever amount remained in the Treasury as the balance due on the adjustment of the accounts of Rodman M. Price belonged under the act of Congress to the defendants as his heirs.

The case was heard upon bill and answer, and the Chancery Court was of opinion that the plaintiffs were entitled to the relief asked so far as it related to the collection by the defendants of the moneys mentioned in the bill of complaint and still

in the Treasury of the United States. It was therefore " ordered and decreed, that the said defendants and each of them be and they are hereby perpetually enjoined and restrained from making any demand upon or application to the Government of the United States, or the Secretary of the Treasury of the United States or any officer of the said Treasury, or from receiving from the United States, or its said Secretary of the Treasury or any officer thereof, any part of the money remaining in the Treasury of the United States at the time of filing said bill of complaint, and which was awarded to Rodman M. Price, deceased, as in the said bill stated, or now there remaining." This judgment was affirmed by the Court of Errors and Appeals of New Jersey, 56 N. J. Eq. ; and the judgment of affirmance is here for review.

1. The first proposition of the plaintiffs in error is that consistently with the statutes of the United States the defendants in error cannot take anything under the orders adjudging that Borcherling, the receiver appointed by the state court, was entitled as between him and the heirs of Price to receive the money remaining to his credit on the books of the Treasury.

This contention is based upon section 3477 of the Revised Statutes of the United States, providing that " all transfers and assignments made of any claim upon the United States, or of any part or share thereof, or interest therein, whether absolute or conditional, and whatever may be the consideration therefor, and all powers of attorney, orders or other authorities for receiving payment of any such claim, or of any part or share thereof, shall be absolutely null and void, unless they are freely made and executed in the presence of at least two attesting witnesses, after the allowance of such a claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof. Such transfers, assignments and powers of attorney must recite the warrant for payment, and must be acknowledged by the person making them, before an officer having authority to take acknowledgments of deeds, and shall be certified by the officer ; and it must appear by the certificate that the officer, at the time of the acknowledgment, read

and fully explained the transfer, assignment or warrant of attorney to the person acknowledging the same."

It is insisted that the orders in the state court assume to transfer or assign Price's claim against the United States in violation of, or without regard to the requirements of the statute, in that no assignment of the claim has ever been freely made; that no warrant for the payment thereof had been issued when those orders were made; and that the indorsement or assignment that Price was ordered to make did not fall within any of the established exceptions under section 3477, such as assignments in bankruptcy and insolvency, and assignments by operation of law.

Are these propositions supported by the decisions of this court in which it has been found necessary to construe that section?

In *United States* v. *Gillis*, 95 U. S. 407, 416, the question was as to the validity of a voluntary transfer of the legal title to a claim under the Abandoned and Captured Property Act of March 12, 1863, for the proceeds of certain cotton seized by the military forces of the United States. The suit was brought by the transferee in the Court of Claims which found in his favor. By this court it was adjudged that he could not maintain the action. While holding that the act of February 26, 1853, c. 81, 10 Stat. 170, from which section 3477 was taken, was of universal application and covered all claims against the United States in every tribunal in which they might be asserted, this court stated that "there are devolutions of title by force of law, without any act of parties, or involuntary assignments compelled by law," to which the statute did not apply.

In *Erwin* v. *United States*, 97 U. S. 392, 397, which was also an action to recover the proceeds of certain cotton captured by the military forces of the United States, it appeared that the original claimant became a bankrupt, and assigned his property to an assignee in bankruptcy. One of the questions was whether the claim for these proceeds, even if it constituted a demand against the Government, was capable of assignment under the above statute. This court said:

" The act of Congress of February 26, 1853, to prevent frauds upon the Treasury of the United States, which was the subject of consideration in the *Gillis case,* applies only to cases of voluntary assignment of demands against the Government. It does not embrace cases where there has been a transfer of title by operation of law. The passing of claims to heirs, devisees or assignees in bankruptcy are not within the evil at which the statute aimed ; nor does the construction given by this court deny to such parties a standing in the Court of Claims."

In *Goodman* v. *Niblack,* 102 U. S. 556, 560, where the question was whether the above statute embraced voluntary assignments for the benefit of creditors, this court, referring to *Erwin* v. *United States,* said : " The language of the statute, ' all transfers and assignments of any claim upon the United States, or of any part thereof, or any interest therein,' is broad enough (if such were the purpose of Congress) to include transfers by operation of law, or by will. Yet we held it did not include a transfer by operation of law, or in bankruptcy, and we said it did not include one by will. The obvious reason of this is that there can be no purpose in such cases to harass the Government by multiplying the number of persons with whom it has to deal, nor any danger of enlisting improper influences in advocacy of the claim, and that the exigencies of the party who held it justified and required the transfer that was made. In what respect does the voluntary assignment for the benefit of his creditors, which is made by an insolvent debtor of all his effects, which must, if it be honest, include a claim against the Government, differ from the assignment which is made in bankruptcy ? There can here be no intent to bring improper means to bear in establishing the claim, and it is not perceived how the Government can be embarrassed by such an assignment. The claim is not specifically mentioned, and is obviously included only for the just and proper purpose of appropriating the whole of his effects to the payment of all his debts. We cannot believe that such a meritorious act as this comes within the evil which Congress sought to suppress by the act of 1853."

The doctrine of these cases has not been modified by any subsequent decision. Nor, as the argument at the bar implied, is that doctrine inconsistent with the decision subsequently rendered in *St. Paul & Duluth Railroad* v. *United States,* 112 U. S. 733. Nothing more was adjudged in that case than that a voluntary transfer by way of mortgage of a claim against the United States for the security of a debt, and finally completed and made absolute by a judicial sale, was within the purview of the prohibition contained in section 3477, and could not be made the basis of an action against the Government in the Court of Claims. Such a voluntary assignment to secure a specific debt was held to be within the mischiefs which that section was intended to remedy. To the same class belongs *Ball* v. *Halsell,* 161 U. S. 72, 79, which was the case of a voluntary transfer of part of a claim against the United States on account of the depredations of certain Indians on the property of the claimant.

While the present case differs from any former case in its facts, we think that the principle announced in *Erwin* v. *United States* and *Goodman* v. *Niblack* justified the conclusion reached by the state court. That court held that it had jurisdiction under the laws of the State, and as between the parties before it, to put into the hands of its receiver any chose in action of whatever nature belonging to Price and of which he had possession or control. The receiver did not obtain from Price in his lifetime an assignment of his claim against the United States. But having full jurisdiction over him, the court adjudged that as between Price and the plaintiffs who sued him the claim should not be disposed of by him to the injury of his creditors, but should be placed in the hands of its receiver subject to such disposition as the court might determine as between the parties before it and as was consistent with law. The suit in which the receiver was appointed was of course primarily for the purpose of securing the payment of the judgment obtained by Samuel Forrest in his lifetime against Rodman M. Price. But that fact does not distinguish the case in principle from *Goodman* v. *Niblack;* for the transfer in question to the receiver was the act

of the law, and whatever remained, whether of property or money, in his hands after satisfying the judgment and the taxes, costs or expenses of the receivership as might be ordered by the court, would be held by him as trustee for those entitled thereto, and his duty would be to pay such balance into court to the credit of the cause "to be there disposed of according to law." Revision of N. J. Laws, 1877, sec. 26, p. 394.

As this court has said, the object of Congress by section 3477 was to protect the Government, and not the claimant, and to prevent frauds upon the Treasury. *Bailey* v. *United States*, 109 U. S. 432; *Hobbs* v. *McLean*, 117 U. S. 567; *Freedman's Savings Co.* v. *Shepherd*, 127 U. S. 494, 506. There was no purpose to aid those who had claims for money against the United States in disregarding the just demands of their creditors. We perceive nothing in the words or object of the statute that prevents any court of competent jurisdiction as to subject-matter and parties from making such orders as may be necessary or appropriate to prevent one who has a claim for money against the Government from withdrawing the proceeds of such claim from the reach of his creditors; provided such orders do not interfere with the examination and allowance or rejection of such claim by the proper officers of the Government, nor in anywise obstruct any action that such officers may legally take under the statutes relating to the allowance or payment of claims against the United States. If a court, in an action against such claimant by one of his creditors, should, for the protection of the creditor, forbid the claimant from collecting his demand except through a receiver who should hold the proceeds subject to be disposed of according to law under the order of court, we are unable to say that such action would be inconsistent with section 3477. It may be that the officers charged with the duty of allowing or disallowing claims against the Government are not required to recognize a receiver of a claim appointed by a court, and may, if the claim be allowed, refuse to make payment except as provided in section 3477. Upon this subject, the Second Comptroller of the Treasury, in his opinion, rendered July

11, 1894, construing the act of February 23, 1891, and in which he held that Price was entitled to receive in his life-time, whatever sum was found to be due him on the adjust-ment of his accounts, but if he died before such adjustment was made his heirs would take, not by virtue of the act of Congress, but according to the laws of descent at the domicil of the deceased, said: "I do not presume for a moment that the Chancery Court of New Jersey could issue an execution and compel payment of this money, nor could any of its powers be brought to bear to compel, without at least addi-tional legislation by Congress, the Comptroller to pay its judgment; but while that is true, yet on the other hand the Comptroller, so far having awaited the adjudication of that Chancery Court, ought to abide by the result of that litiga-tion, and await a final adjudication and certification of the amount, as to who are entitled under the laws of that State. This comes more from comity, and from a disposition on the part of the Treasury officers to obey the laws of the land, and to help to enforce the decrees of the courts that have jurisdic-tion over matters in litigation of this kind, than from any actual authority that a court may have over the Comptroller to compel him to make payment. In conclusion, then, the Comptroller will not at this time act in this matter, but will say to the gentlemen, that they must fight it out in the courts of New Jersey, and that this court will follow the final deci-sion that may be rendered there. . . . . Hence this matter will be suspended until such time as the Comptroller may be put into possession of the final decree, either of the New Jersey Chancery Court, or such court as may have appellate jurisdiction therefrom." Even if it be true that the final order of the state court in relation to the money in question would not impose any legal duty upon the officers of the Treasury, it does not follow that the order of court appointing the receiver would be null and void, as between those who are parties to the cause and who are before the court.

It only remains to say touching this part of the case that if section 3477 does not embrace the passing or transfer of claims to heirs, devisees or assignees in bankruptcy, as held

in *Erwin* v. *United States*, nor a voluntary assignment by a debtor of his effects for the benefit of his creditors, as held in *Goodman*.v. *Niblack*, it is difficult to see how an order of a judicial tribunal having jurisdiction of the parties appointing a receiver of a claim against the Government and ordering the claimant to assign the same to such receiver to be held subject to the order of court for the benefit of those entitled thereto, can be regarded as prohibited by that section.

2. Were the *heirs* of Rodman M. Price entitled upon his death, by virtue of the act of February 23, 1891, to such balance as then remained to his credit in the Treasury of the United States on the adjustment made of his accounts under that act? If they were so entitled, then the final judgment of the Court of Errors and Appeals affirming the judgment of the Chancery Court denied to the plaintiffs in error a right specially set up and claimed by them under the above act; and therefore the jurisdiction of this court to reëxamine that final judgment cannot be doubted. Rev. Stat. § 709.

The plaintiffs in error insist that *Emerson* v. *Hall*, 13 Pet. 409, 413, 414, is decisive in their favor. Although this contention is not without some force, we are of opinion that the judgment in that case does not control the determination of the present case. Emerson, surveyor, Chew, collector, and Lorrain, naval officer, at the port of New Orleans, having seized a brig for a violation of the laws prohibiting the importation of slaves, instituted proceedings that resulted in the condemnation of such vessel and slaves. It had been previously decided in *The Josefa Segunda*, 10 Wheat. 312, that the proceeds could not be paid to the custom-house officers, but vested in the United States. Emerson and Lorrain having died, Congress, on the 3d day of March, 1831, passed an act entitled "An act for the relief of Beverly Chew, the *heirs* of William Emerson, deceased, and the *heirs* of Edward Lorrain, deceased." That act directed the proceeds in court to be paid over to the said Beverly Chew and "the legal representatives" of Emerson and Lorrain, respectively. The question was whether the Emerson part of the proceeds belonged to his heirs, or were assets primarily liable for his

debts. This court, after observing that Emerson had not acted under any law, nor by virtue of any authority, and that his acts imposed no obligation, legal or equitable, on the Government to compensate him for his services, said : " Had Emerson become insolvent and made an assignment, would this claim, if it may be called a claim, have passed to his assignees ? We think, clearly, it would not. Under such an assignment, what could have passed ? The claim is a nonentity. Neither in law nor in equity has it any existence. A benefit was voluntarily conferred on the Government; but this was not done at the request of any officer of the Government, or under the sanction of any law or authority, express or implied. And under such circumstances, can a claim be raised against the Government, which shall pass by a legal assignment, or go into the hands of an administrator as assets ? . . . A claim having no foundation in law, but depending entirely on the generosity of the Government, constitutes no basis for the action of any legal principle. It cannot be assigned. It does not go to the administrator as assets. It does not descend to the heir. And if the Government, from motives of public policy, or any other considerations, shall think proper, under such circumstances, to make a grant of money to the heirs of the claimant, they receive it as a gift or pure donation — a donation made it is true in reference to some meritorious act of their ancestor, but which did not constitute a matter of right against the Government. In the present case, the Government might have directed the money to be paid to the creditors of Emerson, or to any part of his heirs. Being the donor it could, in the exercise of its discretion, make such distribution or application of its bounty as circumstances might require. And it has, under the title of an act, ' for the relief of the heirs of Emerson,' directed, in the body of the act, the money to be paid to his legal representatives. That the heirs were intended by this designation is clear; and we think the payment which has been made to them under this act has been rightfully made, and that the fund cannot be considered as assets in their hands for the payment of debts."

Now, it is said that the grounds upon which in *Emerson* v. *Hall* the claim of the heirs was sustained, exist in the present case; that Price did not act under any law, nor in virtue of any authority, and that his acts imposed no obligation in law or.equity upon the Government that could have been enforced even if suit could have been maintained against it. And the conclusion sought to be drawn is that Congress must have intended by the act of 1891, as it was held to have intended by the act in *Emerson's case*, to legislate for the benefit of the heirs or next of kin of the decedent and not for his personal representatives. But there were other facts in the *Emerson case* which placed that case upon peculiar grounds. Emerson and Lorrain were both dead when the act of March 3, 1831, was passed, and therefore Congress must have had in mind the question whether the Emerson and Lorrain portions of the money on deposit in court should be given to their respective heirs or not. And the question was solved as indicated by the preamble to that.act. The preamble distinctly shows that Congress had in view the *heirs*, and not those who would administer the estate of the two persons whose meritorious services were recognized. Although a preamble has been said to be a key to open the understanding of a statute, we must not be understood as adjudging that a statute, clear and unambiguous in its enacting parts, may be so. controlled by its preamble as to justify a construction plainly inconsistent with the words used in the body of the statute. We mean only to hold that the preamble may be referred to in order to assist in ascertaining the intent and meaning of a statute fairly susceptible of different constructions. *United States* v. *Fisher*, 2 Cranch, 358, 386; *United States* v. *Palmer*, 3 Wheat. 610, 631; *Beard* v. *Rowan*, 9 Pet. 301, 317; *Holy Trinity Church* v. *United States*, 143 U. S. 457, 462; *Coosaw Mining Co.* v. *South Carolina*, 144 U. S. 550. In *Emerson's case* the decision was placed partly on the ground that the title of the act of 1831 indicated that Congress, in using the words : "legal representatives" in the body of the act, had in mind the heirs of Emerson and Lorrain, and not technically their personal representatives. It is a fact not without significance

that the money awarded by the above act of 1831 did not replace any moneys taken by Emerson and Lorrain from their respective estates for the benefit of the Government. They had only rendered meritorious personal services for the public upon which no claim of creditors could be based, but which services Congress chose to recognize by making a gift to the heirs. This was substantially the view taken of the case of *Emerson* v. *Hall* in the recent case of *Blaggé* v. *Balch*, 162 U. S. 439, 458.

The case before us differs from the *Emerson case* by reason of circumstances which we must suppose were not overlooked by Congress when it passed the act of 1891. By advancing to Van Nostrand seventy-five thousand dollars to be used for the Government, Price's ability to meet his obligations to creditors was to that extent diminished. As he had acted in good faith, and in the belief that he was promoting the best interests of the Government, the purpose of Congress was to make him whole in respect of the amount he had in good faith advanced to his successor for public use. He was then alive, and there was no occasion for Congress to think of making any provision for those who might be his heirs. We think that the legislation in question had reference to his financial condition, and there is no reason to suppose that Congress intended that the amount if any found due him upon the adjustment of his accounts should not constitute a part of his absolute personal estate, to be received and applied in the event of his death by his personal representative as required by law.

We concur with the state court in the view that the act of 1891 was not intended to confer a mere gratuity upon Price, but was a recognition of a moral and equitable, if not legal, obligation upon the part of the Government to restore to him moneys advanced in the belief at the time that they would be repaid to him in the settlement of his accounts as a disbursing officer; and that the use of the words "or his heirs" in the act was not to make a gift to the heirs of such sum as upon the required adjustment of his accounts was found to be due their ancestor, and thereby exclude his creditors from

all interest in that sum, but to provide against the contingency of death occurring before the adjustment was consummated, and thus to make it certain that the right to have his accounts credited with the amount paid to Van Nostrand, upon principles of "equity and justice," should not be lost by reason of such death. Under this interpretation of the act, the words "or his heirs" must be held to mean the same thing as personal representatives. We do not perceive either in the words of the act, or in the circumstances attending its passage, anything to justify the belief that Congress had any purpose in the event of the death of Price to defeat the just demands of creditors.

Reference was made in argument to the recent case of *Briggs* v. *Walker*, 171 U. S. 466, 473, 474. It differs in some respects from both the *Emerson case* and the present case, but the decision is in accord with the views herein expressed. It arose under "an act for the relief of the estate of C. M. Briggs, deceased," and the principal question was whether the right given by the act to Briggs' "legal representatives" was for the benefit of his next of kin to the exclusion of his creditors. This court said: "The act of Congress nowhere mentions heirs at law, or next of kin. Its manifest purpose is not to confer a bounty or gratuity upon any one; but to provide for the ascertainment and payment of a debt due from the United States to a loyal citizen for property of his, taken by the United States; and to enable his executor to recover, as part of his estate, proceeds received by the United States from the sale of that property. The act is 'for the relief of the estate' of Charles M. Briggs, and the only matter referred to the Court of Claims is the claim of his 'legal representatives.' The executor was the proper person to represent the estate of Briggs, and was his legal representative; and as such he brought suit in the Court of Claims, and recovered the fund now in question, and consequently held it as assets of the estate, and subject to the debts and liabilities of his testator to the defendants in error." It is to be observed that the court in that case looked both to the body of the act and the preamble in order to ascertain the intention of Congress.

It results that the plaintiffs in error, as heirs of Rodman M. Price, were not denied by the, final judgment of the state court any right secured to them by the act of 1891.

Something was said in argument which implied that Price had wrongly resisted the collection of the Forrest claim and judgment. It is proper to say that so far as the record speaks on that subject, the course of the deceased was induced by the belief on his part that it was a claim which he was not bound in law or justice to pay. Our conclusion does not rest in any degree upon the character of that claim, but entirely upon questions of law arising out of matters that were concluded, so far as this court is concerned, by the action of the state court, and which we have no jurisdiction to review.

We find in the record no error of law in respect of the Federal questions presented for consideration, and therefore the decree below must be

*Affirmed.*