Peelle, J.,
delivered the opinion of the court:
The claimant, as receiver by virtue of appointment by the supreme court of Kings Countjy NY., of the money due from the United States to the firm of Whaley & Taylor, seeks to recover the sum of §17,300 due said firm and which Avas paid to them by the United States after they had been notified of the appointment of said receiver and of the issuance of an order restraining said firm from receiving said money or- draft therefor.
The facts about which there is no controversy briefly are these:
On January 23, 1892, Whaley & Taylor entered into a contract in writing with, the Government to construct at Willets Point, N. Y., two barracks for the sum of §13,950, to be paid in installments during the progress of the work.
Whaley & Taylor entered upon the performance of their contract and so continued until September 1, 1892, during which time they incurred certain indebtedness, shown in finding m, to John J. Leonard, George Scofield, and William K. Hammond, aggregating nearly §7,000.
On the date named, Whaley & Taylor entered into a written contract with their creditors above named whereby it was in substance agreed that they should complete the construction of the barracks so contracted for bj*- them with the defendants, and to that end they were, as recited in said contract, “hired and employed ® * * to provide all the. work, labor, and materials of eveiy kind necessary to complete the said contract, and to go on and complete the said building according to the same,” in consideration of which it ivas agreed that they should be paid, “out of the proceeds to be realized on said contract from the Government, the cost of all work and labor and of all materials which shall be supplied, used, or provided by the parties of the second part in the completion of said contract;” and to secure them in the payment for said work the contractors Whalej" & Taylor agreed to, and did by said agreement, “sell, transfer, and assign to the parties of the second part all of the proceeds of the several and' respective installments or pajunents which may- become due upon the *386 said, contract; the parties of the first part to receive such proceeds so assigned as agents for the parties of the second part, and to immediately pay or deliver the same over to them, and to indorse or deliver all drafts or checks that may be received on account of such proceeds over to said parties of the second part.”-
That Whaley & Taylor agreed not to demand or receive any of the payments or proceeds arising from the work except when the said Hammond, Leonard, or Scofield, or some one of them, were present at the quartermaster’s office at Willets Point, and that when any payment was to be made the said Whaley & Taylor, or one of them, would attend in person at the said quartermaster’s office upon being notified, and would then receive such payment or any draft or check that might be sent there, and immediately indorse or deliver the same over to said Hammond, Leonard, or Scofield.
They further agreed not to apply to any court for the appointment of a receiver of their copartnership property, or make any assignment of the proceeds of said contract, or any installment thereof, or any payment to be made thereupon to any person other than the parties of the second part.
While, on the other hand, it was agreed that said second party might enforce the agreement "‘in equity, or by injunction or mandamus, or other property process as may be agreeable to law and equity;” that out of the money to be handed to said second party they were first to pay themselves for the work and labor and materials they had performed and furnished in and about the construction of the barracks, and then to pay the indebtedness of Whaley & Taylor to said parties so incurred before said contract'was entered into, and the residue, if any, was to be paid to said Whalejr & Taylor.
The claimants’ contention is that as the Supreme Court of Kings County, N. Y., had jurisdiction of the parties and of the subject-matter, the receiver thereby appointed was legally invested with the rights of Whaley & Taylor in respect to the money due them from the United States for the work done by the parties they had so hired and employed, and that therefore the ruling in the case of The United States v. Borcherling (185 U. S., 223) is controlling in the present case.
On the other hand, the defendants contend that the case is *387 ruled by the earlier decision in the ease of St. Paul and Duluth R. R. Co. v. The United States (112 U. S., 733).
It will thus be seen that the decision in the present case turns in the main upon the question as to which one, if either, of the two cases cited is applicable to the facts in the present case.
He vised Statutes, section 3477, provides:
“ Sec. 3477. All transfers and assignments made of any claim upon the United States., or of any part or share thereof, or interest therein, whether absolute or conditional, and whatever may be the consideration therefor, and all powers of attorney, orders, or other authorities for receiving payment of anj"- such claim, or of any part or share thereof, shall be absolutely null and void unless they are freely made and executed in the presence of at least two attesting witnesses, after the allowance of such a claim, the ascertainment of the amount due, and the issuing of a warrant for the pajmient thereof. Such transfers, assignments, and powers of attorne}^ must recite the warrant for payment, and must be acknowledged by the person making them before an officer having authority to take acknowledgments of deeds, and shall be certified by the officer; and it must appear by the certificate that the officer, at the time of the acknowledgment, read and fully explained the transfer, assignment, or warrant of attorney to the person acknowledging the same.”
The language of that section is broad, and, as was said in the case of United States v. Gillis (95 U. S., 407-413), “the words embrace every claim against the United States, however arising, of whatever nature it may be, and wherever and whenever presented.”
Referring to the assignment of a claim before its allowance and the issuance of a warrant therefor, the court in the case of Spofford v. Kirk (97 U. S., 484-488) said:
“We are brought, then, to the inquiry whether such an assignment of a claim against the U nited States, made before the claim has been allowed, and before a warrant has been issued for its payment, has any validity, either in law or equity.”
And referring to the language of section 3477, the court further says:
“It would seem to be impossible to use language more comprehensive than this. It embraces alike legal and equitable assignments. It includes powers of attorney, orders, or *388 other authorities for receiving payment of any such claim, or any part or share thereof. It strikes at every derivative interest, in whatever form acquired, and incapacitates every claimant upon the Government from creating- an interest in the claim in any other than himself.”
Further, in the same case, the court, in speaking of their ruling in the case of the United States v. Gillis (supra) in respect to the right of the assignee of a claim to maintain an action in the Court of Claims, said:
“ We held he could have no standing there. We held also that such an assignee could not prosecute the claim in any court, or before the Treasury, against the Government. We were not called upon to decide whether such assignments were invalid as between the assignor and the assignee. But, if after the claim in this case was allowed, and a warrant for its payment was issued in the claimant’s name, as it must have-been, he had gone to the Treasury Department for his money, it is clear that no assignment he might have made, or order he might have given, before the allowance would have stood in the way of his receiving the whole sum allowed. The United States must have treated as a nullhy any rights to the claim asserted by others. It is hard to see how a transfer of a debt can be of no force as between the transferee and the debtor, and yet effective as between the creditor and his as-signee to transmit an ownership of the debt, or create a lien upon it. Yet, if that might be — and we do not propose now to affirm or deny it — the question remains whether the act of Congress was not intended to render all claims against the Government inalienable alike in law'and in equity, for every purpose, and between all parties. The intention of Congress must be discovered in the act itself. It was entitled ‘ An act to prevent frauds upon the Treasury of the United States.’ It may be assumed, therefore, that such was its purpose. What the frauds were against which it was intended to set up a guard, and how they might bo perpetrated, nothing in the statute informs us. We can only infer from its provisions . what the frauds and mischiefs had been, or were apprehended, which led to its enactment. One, probably, was the possible presentation of a single claim by more than a single claimant, the original and his assignee, thus raising the danger of paying the claim twice, or rendering necessary the investigation of the validity of an alleged assignment. Another and greater danger was the possible combination of interests and influences in the prosecution of claims which might have no real foundation;” and further they say that “the language of the act is too sweeping and positive to justify us in giving it a limited construction.”
*389 Nor is the assignment sufficient in substance or form to pass title to the claim after its allowance and the issuance of a warrant for the payment thereof. Hence there is no escape from the conclusion that, in so far as Whaley & Taylor, upon whatever consideration, sought to transfer o'r assign absolutely or conditionally their claim against the Government, such assignment as against the Government was “ absolutely null and void.”
But was the agreement so made void as between the assignors and the assignees, for, if it was, then it could not form the basis of an action for the appointment. of a receiver. That is to sa}^, if the agreement as between the parties thereto was null and void, because made so by ■ statute as against the Government, then, of course, no proceedings, based thereon looking to its enforcement, could be maintained.
But though the assignment of a claim may be void as between the assignor and his assignee, yet the title to such claim maj’' devolve by operation of law so as to pass from the original claimant into the hands of an officer authorized by a court of competent jurisdiction to collect it. Such was the ruling in the case of Erwin v. United States (97 U. S., 392), whore the court, in this respect, said:
“The act of Congress of February 26,1853 (10 Stat. L., 170), to prevent frauds upon the Treasury of the United States, applies only to cases of voluntary assignment of demands against the Government. The passing of claims to heirs, devisees, or assignees in bankruptcy is not within the evil at which it aimed.”
In the case of the St. Paul and Duluth Railroad Co. v. United States (112 U. S., 733), upon which the defendants rely, it was held that the voluntaiy transfer of a claim against the Government by way of mortgage, made absolute bjr judicial sale on foreclosure, was within the provision of the Revised Statutes, section 3177, prohibiting the assignment of claims against the Government; and that therefore the assignee of a claim so arising could not enforce the collection thereof against the Government in its own name — -i. e., that the claim was not one assigned bjr operation of law.
However, in that case the court, in respect of the claim Avhich it was alleged had passed by virtue of the mortgagé and *390 sale, held that the words of description in the mortgage and decree as to the property and interests conveyed wore not “sufficient to pass the interests therein of the original company to the purchaser at the sale.” Nor did the purchaser under the decree of foreclosure thereby become assignee of the contract between the mortgagor and the Government for carrying the mail, and for these reasons the court say the purchaser “can claim nothing as such in this suit.” So the question in the present case was not involved in that case.
In construing section 3477 the Supreme Court in the case of Price v. Forrest (173 U. S., 410-423) said:
“As this court has said, the object of Congress by section 3177 was to protect the Government, and not the claimant, and to prevent frauds upon the Treasury (Bailey v. United States, 109 U. S., 432; Hobbs v. McLean, 117 U. S., 567; Freedman's Savings Co. v. Shepard, 127 U. S., 494, 506). There was no purpose to aid those who had claims for money against the United States in disregarding the just demands of their creditors. We perceive nothing in the words or object of the statute that prevents any court of competent jurisdiction as to the subject-matter and parties from making such orders as majr be necessary or appropriate to prevent one who has a claim for money against the Government from withdrawing the proceeds of such claim from the reach of his creditors; provided such orders do not interfere with the examination and allowance or rejection of such claim by the proper officers of the Government, nor in anywise obstruct any action that such officers may legally take under the statutes relating to the allowance or payment of claims against the United States. If a court, in an action against such claimant by one of his creditors, should, for the protection of the creditor, forbid the claimant from collecting his demand except through a receiver who should hold the proceeds subject to be disposed of according to law under the order of court, we' are unable to say that such action would be inconsistent with section 3477.”
In the case of the United States v. Borcherling (supra), affirming the judgment of this court (35 C. Cls. R.., 311), a judgment had been obtained by one Forrest against Price m the Supreme Court of New Jersey and an execution had been returned unsatisfied. Thereafter the United States became indebted to Price in a large sum of money, the amount of which had been determined and was about to be paid to him, to roach which an application was made in the New Jersey *391 court for tbe appointment of a receiver of tbe money or draft soon to be delivered to bim and for an order restraining him from receiving tbe same from tbe Government or indorsing such draft, of all of which the United States were notified, but disregarded and delivered to their creditor Price tbe money so sought to be applied on the judgment against him instead of to the receiver under the order of the court.
The court, after reviewing the authorities showing the distinction between payments by way of gratuity and not of right, said:
‘ ‘ Here the Government was not the donor of the money of Price, but was its custodian, awaiting its lawful distribution. As to the contention that the debt due from the United States to Price could not be transferred from Price to the claimant bjT operation of the laws of New Jersey, nor by any decree the courts of New Jersey, operating under such laws, could make, it is sufficient to say that this court has held otherwise.”
in the case of Vaughan v. Northup (15 Pet., 16) the court said:
“ The debts due from the Government of the United States have no locality at the seat of government. The United States in their civil capacity have no particular place of domicile, but possess, in contemplation of law, an ubiquity throughout the United States; and the debts due by them are not to be treated like the debts of a private debtor, which constitute local assets in his own domicile.”
In the case of Price v. Forrest (supra). the question was between the heirs of Price and the receiver as to which was entitled to receive from the United States the money due Price. The New Jersey court held that the receiver was, and on appeal to the Supreme Court of the United States the decree was affirmed in respect to the Federal question involved, and in speaking of what was settled in that case the court in the Borcherling case says:
“Two things were thus determined — first, generally that it was competent for a State court of the domicile of the creditor of the United States, and having jurisdiction over his person, to decide a controversy between his heirs and creditors as to the right to receive monejrs held in trust by the United States; and, second, specifically under the facts of the *392 present case, that the title to the money of Price in the Treasury of the United States had passed, under the laws of the State of New Jersey'and the decree of its courts, from Price and his heirs, and had become vested in Borcherliug, the receiver.”
And in speaking of the jurisdiction of the Court of Claims .to entertain jurisdiction in such cases the court said:
“It is not open to doubt that the Court of Claims has jurisdiction to entertain a claim of the receiver to receive the fund, the title to which had thus become vested in him. The jurisdiction of that court extends throughout the United States. It issues writs to every part of the United States, and is specially authorized to enforce them (10 Stat., 612, sec. 3). By establishing this court, the United States created a tribunal to determine the right to receive moneys due by the Government. Such legislation did not leave the Treasury or its officers free to arbitrarily select between conflicting claimants the one to whom payment should be made. * * * When analyzed, this contention will be perceived to be only a renewal of the one already considered, namety, that a ministerial officer, having no judicial or statutory powers in the premises, in a case wherein the Government was the debtor, could arbitrarily, without notice to the legal holder of the claim, pay the monej' in dispute in this case over to Price. This, we have seen, he had no power under the law to do, and such a disposition of the money could not be successfully pleaded in the Court of Claims as a lawful discharge of the United States.”
Prom the authorities cited we may fairly conclude:
.First. That the object and purpose of section 3177 was to prevent frauds upon the Treasury and not to aid those having claims against the Government to disregard the demand of their creditors.
Second. That the language of the section does not prevent any court of competent jurisdiction as to the subject-matter and parties from making such orders, not inconsistent therewith, as may be necessary to prevent a creditor of the Government from withdrawing the proceeds of his claim from the reach of his creditors.
Third. That if such court in any action against such claimant by one of his creditors should, for the protection of the creditor, forbid the claimant from collecting his demand except through a receiver who should hold the proceeds subject to *393 be disposed of according to law under tlie order of court, such action would not be inconsistent with said section.
Fourth. That by establishing- the Court of Claims the Congress “created a tribunal to determine the right to receive moneys due by the Government. Such legislation did not leave the Treasury or its officers free to arbitrarily select between conflicting claimants the one to whom payment should be made.”
Fifth. That a ministerial officer, having no judicial or statu-toiy powers in the premises, in a case wherein the Government is the debtor, can not arbitrarily, without notice to the legal holder of the claim, pay the money in dispute to such creditor, and that such payment “could not be successfully pleaded in the Court of Claims as a lawful discharge of the United States.”
Applying the principles thus formulated from the authorities cited, how stands the present case?
By the terms of the agreement or assignment of Whaley & Taylor, William K. Hammond, John J. Leonard, and George Scofield were hired and employed to provide all the work, labor, and materials of every kind necessary, and to complete the buildings according to the contract of Whaley & Tajdor with the Government, for which, as the agreement recites, they w'ere to be paid “ out of the proceeds to loe realized on said contract from the Government/” that the proceeds thus to be realized might be applied as agreed upon, Whaley & Taylor agreed to and did “sell, transfer, and assign” to Hammond, Leonard, and Scofield the payments to become duo from time to time on account of said work, they, said Whaley & Taylor, reserving the right to receive from the Government theproceeds so assigned as agents for Hammond, Leonard, and Scofield; and upon the receipt thereof "to immediately pay the same over to them or to indorse any check or draft given therefor.
The legal effect of the agreement, taken as a whole, was that Hammond, Leonard, and Scofield were employed to furnish the labor and materials therefor and complete the work according to the contract of Whaley & Taylor with the Government, and that upon the receipt of payments from the Government therefor from time to time by Whaley & Taylor, *394 they would at once pay the same over to Hammond, Leonard, and Scofield.
The assignment did not invest or purport to invest Hammond, Leonard, and Scofield with the right to receive or collect such payments or to interfere with the allowance and payment of the claims by the Government, but the purpose of the agreement was that while Whaley & Taylor were to continue to receive the payments as they became due for the work, they were upon the receipt thereof, as between them and Hammond, Leonard, and Scofield, to become the agents of the latter, and as such to at once pay the same over to them.
It was further agreed by Whaley & Taylor that the agreement or assignment might “ be specifically enforced in equity, or by injunction or mandamus, or other appropriate process, as may be agreeable to law and equity.” On the other hand, Whaley & Taylor agreed not to make demand or receive any of said payments or proceeds from the Government except when Hammond, Leonard, and Scofield, or some one of them, was present at the quartermaster’s office at Willets Point, at which time they were to receive such payment or any draft or check drawn therefor and immediately indorse and deliver the same over to them.
Of course as soon as the draft or check went into the hands of Whaley & Taylor, who were alone responsible to the Government for the work under their contract, section 3477 ceased to apply, and they could then make any contract in respect thereto they saw fit, or they might before that time make any contract they saw fit looking to the application of such proceeds after the same came into their hands, and the latter appears to be what they endeavored to make by the agreement or assignment which they made.
While the assignment thus made may have, and perhaps did, become known to the quartermaster at Willets Point, through whom the payments were from time to time made in accordance therewith, such knowledge would not operate in law to change or transfer the legal liability of the Government from the contractors to their assignees. Such transfer could only be made effective in the manner prescribed by *395 section 3477 after the allowance of the claim or by operation of law.
From the facts in this case and the authorities we have re viewed, we reach the conclusion that .as between the parties the assignment was valid and enforcible in equity; and the Supreme Court of Kings County, N. Y., having acquired jurisdiction of the parties and of the subject-matter, the orders and decree óf said court in respect of the rights of the parties before it are binding and therefore entitled to full faith and credit.
The court then having acquired jurisdiction, and having ascertained that Whaley & Taylor had not only refused to comply with their agreement to receive and indorse the draft to Hammond, Leonard, and Scofield, but were about to receive and appropriate the proceeds thereof to their own use, made such orders in the premises as to prevent them from withdrawing the proceeds of their claim from the Treasury, and appointed the claimant herein as receiver to collect and apply the proceeds thus to be received under the order of the court, which orders were followed with a final-decree for specific performance, i. e., Whaley & Taylor were commanded to receive, indorse, and forthwith deliver to the receiver any check, draft, or warrant issued and delivered to them for the money due under their contract; and to that end the court decreed that all the right, title, and interest of all the parties to the transaction were vested in the receiver with full power and authority to demand and receive payment thereof from the United States, of all of which, as the findings recite, the Secretaiy of War, under whose supervision the work was performed and the payments theretofore made, and the Secretaiy of the Treasury were duly notified and from each of whom payment was demanded by said receiver before the delivery of the draft to said Whaley & Taylor as aforesaid.
Acting on the advice of the Attorney-General, the Secretary of War, while the case was pending in the State court of New York, and after the appointment of a receiver as aforesaid, informed the receiver, through his attorneys, that the Attorney-General had advised the Secretary of War to retain the fund in his hands until the controversy was “determined *396 by final adjudication-of tho whole matter by the. tribunal to which the parties may last resort.” •
Notwithstanding the Secretary of the Treasury was advised of the restraining and other orders of the court and of tho appointment of the receiver, and notwithstanding payment had been demanded of him by the receiver, he, in disregard of the orders so made by the court and without any notice to the receiver, delivered the draft or check, theretofore sent to the quartermaster at Willets Point and by him returned, to Whaley & Taylor, who indorsed the same and received tho money thereon and appropriated it to their own use.
In delivering tho draft to Whalej’ & Taylor tho Secretary of the Treasury thereby aided them to disregard, if not to defraud, their creditors, which latter, with the knowledge of the Government agent— the quartermaster — had in good faith performed the work in constructing the barracks according to the contract of Whaley & Taylor, and consequently to tho satisfaction of the Government, who received the benefit thereof.
The equities of this case are clearly with the employees who performed the work. The contractors did not bj" their agreement deprive themselves of the right to receive from tho Government the several payments as they became due for tho work performed by their employees. On the contrary, that right they reserved to themselves, but as between thorn and Hammond, Leonard, and Schofield they agreed upon the receipt thereof to become the agents of the latter and as such to at once account to them therefor.
It was to enforce this latter agreement — i. e., tho agreement of Whaley & Taylor, to indorse to their employees the draft so issued by the Government in payment of the final completion of the work — that the proceedings were commenced in the Now York court. As set forth in the'findings, it was shown to the New York court that Whaley & Taylor had refused to indorse and deliver the draft sent to them through the quartermaster at Willets Point, and for that reason the quartermaster, acting in the interest of the employees who had in good faith performed the work, refused to deliver the draft to Whaley & Taylor and thereafter returned it to the Secretary of W ar.
*397 As shown from the certified copy of the proceedings in the New York court, made a part of the petition herein, the court found as matters of fact that, while Whaley & Taylor had made certain progress in the performance of their contract with the Government, they had contracted certain indebtedness to Hammond, Leonard, and Schofield which they were', unable to pay, and were also unable to complete their contract; that Hammond, Leonard, and Schofield had, pursuant to their employment by Whaley & Taylor, completed the work, for which there remained due them the sum of $18,350, then about to be paid by check or draft to Whaley & Taylor through the quartermaster at Willets Point, but which Whaley & Taylor declared they would not indorse and deliver to Hammond, Leonard, and Schofield as they had agreed; and further the court found “that the said Whaley & Taylor are insolvent.”
The New York court had jurisdiction of the parties, and by its order forbade Whaley & Taylor from collecting their demand, “except through a receiver who should hold the proceeds subject to be disposed of according to law under the order of the court.” Price v. Forrest (supra), or, as was further said in that case, at page 424, “If section 3477 does not embrace the passing or transfer of claims to heirs, devisees, or assigns in bankruptcy, as held in Erwin v. United States, nor a voluntary assignment by a debtor of his effects for the benefit of his creditors, as held in Goodman v. Niblack, it is difficult to see how an order of a judicial tribunal having jurisdiction of the parties appointing a receiver of a claim against the Government and ordering the claimant to assign the same to such receiver, to be held subject to the order of court for the benefit of those entitled thereto, can be regarded as prohibited by that section.”
The appointment of the receiver and the orders of the court put in dispute the rightful claimant to the fund in controversy, and it was not for the Secretaiy of the. Treasury to determine, in violation of the rights of the receiver and the orders of the court, to deliver the draft or the proceeds thereof to Whaley & Taylor until the final termination of the cause, as had been advised by the Attorney-General, the law *398 officer of tlie Government, and therefore we are of the opinion, though not free from doubt, that the proceedings in the New York court in the appointment of the receiver coupled with the orders made by that court, operated in law to transfer the claim in controversy; as against Whaley & Taylor, to the receiver, who had the right to receive and collect the same and apply it according to law under the order and direction of the court appointing him, and such payment bjr the Secretary of the Treasury to him would have been a complete and final' discharge of the United States.
It follows, if we are right in our conclusion, that the Secretary of the Treasury, under the circumstances of this case, had no right to pay the proceeds or deliver the draft therefor to Whaley & Taylor, from the collection and receipt of which they had been restrained by the order of the court, and whose right thereto had been transferred by operation of law to the receiver, and the receiver being entitled thereto, he is entitled to recover on the facts of this case, and judgment will be entered accordingty.
• Wright and Howry, JJ., did not sit in this case and took no part in the decision.