## UNITED STATES *v.* GILLIS.

1. The act entitled "An Act to prevent frauds upon the treasury of the United States," approved Feb. 26, 1853 (10 Stat. 170), embraces every claim against the government, however arising, of whatever nature, and wherever and whenever presented.
2. So far from giving new potency to assignments of rights of action, and from changing the rule of the common law touching such rights, that act denies any effect to powers of attorney, orders, transfers, and assignments which before were good in equity, and which a debtor, when they were brought to his notice, was bound to regard.
3. The act of Feb. 24, 1855 (10 Stat. 612), establishing the Court of Claims, is not an enabling act, nor does it expressly or by necessary implication repeal any of the provisions of the act of Feb. 26, 1853, or make claims assignable which, before its enactment, were incapable of assignment.
4. Congress has given a legislative construction of the act of 1853, by including and re-enacting it in sect. 3477 of the Revised Statutes.
5. The court, therefore, upon consideration of the above statutes, *holds*, 1. That claims against the United States cannot be assigned, so as to enable the assignee to bring suit in his own name in the Court of Claims. 2. That, in cases arising under the act of March 3, 1863 (12 Stat. 820), the ownership claimed and required to be proved is that which existed at the time when the property in question was captured, and that the assignee of the claim for the proceeds of such property is not entitled to sue for them in said court.

APPEAL from the Court of Claims.

This suit was brought June 11, 1867, in the court below, by Thomas H. Gillis, in his own name, to recover the proceeds of one hundred and eight bales of cotton seized under the Abandoned and Captured Property Act of March 12, 1863, as the property of John H. Ryan, at Charleston, S. C., in March, 1865, by the military forces of the United States.

The Court of Claims found the following facts: —

1. In March, 1865, one John H. Ryan, of Charleston, S. C., was the owner of one hundred and three bales of upland cotton and five bales of sea-island cotton, which were during that month seized at said Charleston by military officers of the United States, turned over to the agents of the Treasury Department, transported to New York, and there sold, and the net proceeds thereof covered into the United States treasury, amounting to the sum of $130.33 per bale for the upland cotton, and $231.61 per bale for the sea-island cotton.

2. Some time in October or November, 1866, said Ryan transferred the legal title to his claim against the United States for the proceeds of said cotton so covered into the treasury to Thomas H. Gillis, of New York, and assented to the bringing this action thereon in the name of said Gillis.

3. After the institution of this action, said Thomas H. died; and Catherine I. Gillis was duly appointed administratrix of his estate by the Surrogate Court of the county and State of New York, on the sixteenth day of July, 1868, and has since been admitted by the court to prosecute this suit as such administratrix.

4. The transfer of the claim, as set forth in the second finding, was made through one Van Ness, at New York, under a power of attorney from said Ryan, and contract, the full terms of which have not been proved. But it appears that said Ryan (since deceased) assented to and affirmed said transfer. Subsequently a controversy arose between the present claimant and the administrator of said Ryan as to an equitable interest set up by said administrator in some portion of the money which might be recovered. Since this action was instituted, a compromise has been made between said claimant and said Ryan's administrator, by which it is agreed that a certain part (but how much it does not appear) of the amount recovered shall be paid over to said administrator by the claimant's attorneys of record.

The court thereupon found as a conclusion of law that the claimant was entitled to recover $13,423.99, as the proceeds of one hundred and three bales of upland cotton, and $1,158.05, as the proceeds of five bales of sea-island cotton, in all, the sum of $14,582.04, and rendered judgment accordingly. The United States brought the case here.

*Mr. Assistant Attorney-General Smith* for the appellant.

The Court of Claims possesses no equity powers, and cannot pass upon equitable claims. *Alire's Case,* 6 Ct. of Cl. 575; *Harvey's Case,* 8 id. 512. If it could, an assignee of an unliquidated claim against the United States would have no standing in that court, as the act of Feb. 26, 1853, 10 Stat. 170, renders void the assignment of such a claim. *Sine's Case,* 1 Ct. of Cl. 12; *Cooper's Case,* id. 87; *Pierce's Case,* id. 288; *Cote's*

*Case*, 3 id. 65; *Adam's Case*, id. 332; *Stowe's Case*, 5 id. 371; *Atocha's Case*, 6 id. 69; *Becker* v. *Sweetzer*, 15 Minn. 427.

Such a claim was not assignable at common law; and this court, in *United States* v. *Robeson*, 9 Pet. 319, held that there was no act of Congress establishing a different rule.

A claim to personal property, or to its proceeds, in the adverse possession of another, cannot be sold so as to invest the purchaser with a right of action in his own name. *Gardner* v. *Adams*, 12 Wend. (N. Y.) 297; *Stogdell* v. *Fugate*, 2 A. K. Mar. (Ky.) 61; *Young* v. *Ferguson*, 1 Litt. (Ky.) 298; *Com.* v. *Fuqua*, 3 id. 41; *Brown* v. *Lipscomb*, 9 Port. (Ala.) 472; *Goodwyn* v. *Lloyd*, 8 id. 237; *McGoon* v. *Aukeny*, 11 Ill. 558; *Davis* v. *Herndon*, 39 Miss. 484.

Nor has an assignment of a part of a claim ever been recognized as operative to give such a right. *Mandeville* v. *Welch*, 5 Wheat. 277; *Robbins* v. *Bacon*, 3 Me. 346; *Gibson* v. *Cooke*, 20 Pick. (Mass.) 5; *Fairgrieves* v. *Lehigh Navigation Co.*, 2 Phil. (Pa.) 182; *Boyd* v. *Rumsey*, 2 Mar. J. J. (Ky.) 42; *White* v. *Buck*, 7 B. Mon. (Ky.) 547; *Raines* v. *United States*, 11 Ct. of Cl. 648.

The prohibition in the act of 1853 against the assignment of claims was not repealed, so far as the Court of Claims is concerned, by the act of Feb. 24, 1855, 10 Stat. 612, nor by that of March 3, 1863, 12 id. 820, giving it jurisdiction over such a claim as this case involves.

Congress expressly re-enacted the act of 1853 by sect. 3477 Rev. Stat. The Revised Statutes are entitled " An Act to revise and consolidate the statutes of the United States in force on the first day of December, A.D. 1873," and do not purport to embrace any new legislation. The act having been thus regarded as in force at that date, this court will not declare that it was repealed by implication. Dwarris on Stat. 154; *Wood* v. *United States*, 16 Pet. 362; *McCoal* v. *Smith*, 1 Black, 470; *Beals* v. *Hale*, 4 How. 53; *Pratt* v. *Atlantic & St. Lawrence Railroad Co.*, 42 Me. 587; *Ingalls* v. *Cole*, 47 id. 540; *Bowen* v. *Lease*, 5 Hill (N. Y.), 225; *Wallace* v. *Bassett*, 41 Barb. (N. Y.) 96; *Bank* v. *Commonwealth*, 10 Pa. St. 448; *Attorney-General* v. *Brown*, 1 Wis. 525; *Lee* v. *Forman*, 3 Metc. (Ky.) 116.

But even if the act of 1853 is not in force, the judgment must be reversed. The act of March 3, 1863, *supra*, limits a recovery to the owner of the property, at the time of its abandonment or capture. The privilege of invoking the jurisdiction of the court below, in cases for which that act provides, is a personal one, and attaches upon the concurrence of the loyalty of the claimant, his former ownership of the property, and his present right to the proceeds. *Carroll* v. *United States*, 13 Wall. 151; *Haycraft* v. *United States*, 22 id. 81.

*Mr. Halbert E. Paine* and *Mr. Benjamin F. Grafton*, contra.

The rule of construction applicable to this case was laid down in *United States* v. *Palmer*, 3 Wheat, 610. The act of 1853 was designed only to meet the necessities of the Treasury Department. If its first section could have been construed to apply to cases in the Court of Claims, when it was subsequently organized, the acts establishing and regulating that court are so repugnant to that section, that they would have worked its repeal as to such cases. They entirely satisfy the rule in *Wood* v. *United States*, 16 Pet. 342, that there must be a positive repugnancy between the provisions of the new and those of the old statute, and even then the latter is repealed only *pro tanto*, to the extent of the repugnancy; and they unmistakably recognize that claims of which that court has jurisdiction may be assigned. 10 Stat. 612, sect. 1; 12 id. 767, sect. 12; 15 id. 75, 79, sects. 4, 8.

The cases are in harmony with this view. *Lawrence* v. *United States*, 8 Ct. of Cl. 254; *Cavender* v. *United States*, id. 285; *The Floyd Acceptances*, 7 Wall, 666; *United States* v. *Anderson*, 9 id. 67; *United States* v. *Burns*, 12 id. 253.

The question whether an assignee of a chose in action can sue in his own name does not, however, arise. The legal effect of the transfer was to pass the title to the property, or its proceeds held by the United States as trustees.

The United States insists that Congress used the word "owner" in the act of 1863 as designating the original owner, but not his assignee. The scope, intent, and reason of the act justify the construction that executors, administrators, or assignees, as well as owners, are embraced by its provisions.

The entire legal title to the whole of the property having been transferred (and it only can be set up in the Court of Claims), we submit that the findings of fact conclusively establish the right of the defendant in error to recover.

MR. JUSTICE STRONG delivered the opinion of the court.

The plaintiff seeks to recover in this action the proceeds of the sale of one hundred and eight bales of cotton, which, in March, 1865, were the property of John H. Ryan, of Charleston, S. C. During that month the cotton was there taken by the military officers of the United States, as directed by the Captured and Abandoned Property Act, transported to New York and sold, and the net proceeds of the sale have been covered into the treasury. The plaintiff, as administratrix of Thomas H. Gillis, now asserts a right to recover the proceeds by virtue of an alleged assignment of the claim made by Ryan, the former owner of the cotton, to her intestate.

It is obvious that, if no such assignment was made, or if, when made, it was inoperative to transmit the legal right to the claim, the suit cannot be maintained in the name of the plaintiff. Then there is no privity between her and the United States, and she is not the " owner," who alone is permitted to sue in the Court of Claims. That court found as facts that some time in October or November, 1866, Ryan transferred the legal title to his claim against the United States for the proceeds of the cotton to the plaintiff's intestate, and assented to the bringing this action thereon in the name of Gillis. The transfer was made through one Van Ness, under a power of attorney from Ryan, and a contract, the full terms of which have not been proved, though the transfer was subsequently assented to and confirmed by Ryan. Subsequently a controversy arose between the present claimant and the administrator of Ryan, who had deceased, respecting an equitable interest claimed by said administrator in some portion of the money which might be recovered, and since the present action was brought a compromise has been made by which it is agreed that a part of the amount recovered shall be paid to the said administrator by the claimant's attorneys of record. Such, in substance, are the findings, so far as they relate to the transfer

of the claim by Ryan to the claimant's intestate. What the Court of Claims intended by finding that the legal title to the claim for the proceeds of the cotton was transferred to Gillis is not clear. And how that could be found, when the alleged transfer was under a power of attorney and contract, the full terms of which, the court finds, had not been fully proved, it is equally hard to understand. It seems probable all that the finding means is that Ryan's power of attorney and contract sought to empower Gillis to bring suit in the latter's name for the recovery from the United States of the net proceeds of sale of the cotton then in the treasury, and to retain the whole or a part of what might be recovered. However this may be, a transfer of the claim, sufficient to vest in the transferee the legal ownership thereof and give him a standing in the Court of Claims, was impossible, unless aided by some statute. At best, the claim, before its attempted transfer, was a mere right in action and a demand for an unliquidated sum of money. This is true whether the avails of the cotton sold are to be regarded as money had and received for the use of Ryan, or as held in trust for him, or promised to him by the provisions of the Captured and Abandoned Property Act. But choses in action, which are not commercial instruments, though assignable in equity in some cases, are not generally assignable at common law. And certainly the holder of a mere equitable right can have no standing as a plaintiff in the Court of Claims. Apart from the fact that there is no privity between the United States and an equitable holder of a claim against the government, obtained by him through an assignment, the Court of Claims is without power to adjudicate upon merely equitable rights. *Bonner* v. *United States*, 9 Wall. 156.

If, therefore, Ryan's assignment to Gillis operated as a transfer of the legal ownership of his claim against the United States, so as to enable the assignee to sue in his own right in the Court of Claims, it must be because there is some statute that has changed the rule of the common law, and given to an assignment the effect which, prior to the statute, it did not have. In *United States* v. *Robeson*, 9 Pet. 319, decided in 1835, it was said by this court: "There is no law of Congress which authorizes the assignment of claims against the United

States, and it is presumed, if such an assignment is sanctioned by the Treasury Department, it is only viewed as an authority to receive the money, and not as vesting in the assignee a legal right. But whatever may be the usage of the Treasury Department on this subject, it is clear that such an assignment, as between individuals, on common-law principles, cannot be regarded as transferring to the assignee a right to bring an action at law on the account in his own name, or to plead it by way of set-off to an action brought against him, either by an individual or the government." No act of Congress since 1835 has given negotiability to claims against the government, or given new effect to attempted transfers. On the contrary, an act, approved Feb. 26, 1853, entitled "An Act to prevent frauds upon the treasury of the United States," 10 Stat. 170, sect. 1, enacted "that all transfers and assignments" thereafter "made of any claim upon the United States, or any part or share thereof, or interest therein, whether absolute or conditional, and whatever may be the consideration therefor, and all powers of attorney, orders, or other authorities for receiving payment of any such claim, or any part or share thereof, shall be absolutely null and void, unless the same shall be freely made and executed in the presence of at least two attesting witnesses, after the allowance of such claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof." The seventh section enacts that "the provisions of this act," as also those of the prior act of July 29, 1846, entitled "An Act in relation to the payment of claims," "shall apply and extend to all claims against the United States, whether allowed by special acts of Congress or arising under general laws or treaties, or in any other manner whatever." No language could be broader or more emphatic than these enactments. The words embrace every claim against the United States, however arising, of whatever nature it may be, and wherever and whenever presented.

So far are they from giving new potency to assignments and transfers of rights in action, so far from changing the common-law rule that such rights are not assignable, the statute strikes down and denies any effect to powers of attorney, orders, transfers, and assignments which before were good in equity, and

which a debtor was bound to regard when brought to his notice.

It has been argued on behalf of the claimant in this case that this act, the act of 1853, is applicable only to claims asserted before the Treasury Department. This is inferred from the title of the act, and from the fact that at the time when it was passed there was no Court of Claims in existence, and claims were settled in the Treasury Department, without opportunity to cross-examine witnesses. The frauds made possible by this mode of settlement, it is said, Congress had solely in view. But it is an unwarrantable assumption to assert that Congress had in mind only claims presented to the Treasury Department. When the act was passed, many claims were presented to Congress, and a vast number were set up by way of defalcation, in suits brought by the government, where there was a full opportunity to cross-examine the witnesses called in their support. That Congress had all such claims in view, and intended to prevent their assignment, and debar any assignee from setting them up, is, we think, altogether probable. If it be said the danger the act sought to provide a guard against was that fraudulent assignments of just claims might be imposed upon the accounting officers, so that the government, after one payment to a pretended assignee, might find itself confronted by the real creditor and be called upon to pay again, the answer is that the same danger would attend the payment or allowance to an assignee, after a trial in court, or after a private act passed by Congress. We discover nothing in reason, nothing in the mischief the act was plainly intended to remedy, and nothing in the language employed tending to warrant the admission of any exceptions from the comprehensive provisions made; nothing that can justify our holding that, when Congress said all transfers or assignments, partial or entire, absolute or conditional, of claims against the United States shall be null and void, they meant they should be in operation only when presented to the accounting officers of the treasury, but effective when presented everywhere else. Such was not the construction given to the act by the Supreme Court of Minnesota in the case of *Becker* v. *Sweetzer*, 15 Minn. 427, where the validity of an assignment

of such a claim came in question. And we are not informed that any court held such to be the meaning of the act, until the Court of Claims, in 1872, adopted it. *Lawrence's Case* and *Cavender's Case*, 8 Ct. of Cl. 252 and 281. Even in that court its earlier decisions were different. In *Sine's Case*, 1 id. 12, in *Cooper's Case*, id. 87, and in the *Cote Case*, 3 id. 64–71, it was decided that all transfers and assignments of claims against the United States were made void by the statute, not only when the assignees set up the claims in the Treasury Department, but also when they attempted to sue in the Court of Claims, and very convincing reasons were given for the decision. It was said with great force, " The act operates directly on the claims themselves, and not as limitations on or definitions of the powers of those who are to adjust them or adjudicate upon them." And it might have been added, the act makes no reference to the accounting officers. The departure from this ruling made in the two cases reported in the eighth volume of Court of Claims reports seems to have been made with a view to reconcile, if possible, the enactment with some expressions made in the subsequent act of 1855 establishing the Court of Claims. But the latter is not an enabling act. It gives to the court jurisdiction of all claims of a specified description, and only incidentally speaks of assignments. It requires the petition to set out all assignments of the claim, or any part thereof. It requires the record to show the allegiance of the claimant, and the original and every prior owner thereof, where the claim has been assigned. It must be admitted the act contemplates the possibility of an effective assignment of some claims. What those are, it is not necessary now to determine. Even the act of 1853 excepted from its sweeping provisions certain claims, which were liqui-- dated, and for which warrants are drawn. It is enough, how- ever, that a later statute, not declaratory in its character, cannot be relied upon for the purpose of giving a construction to a former act plain in its terms. *Ingalls* v. *Cole*, 47 Me. 530.

That the act creating the Court of Claims did not work a repeal of any provisions of the act of 1853, nor itself make claims assignable that were incapable of assignment before its enactment, is beyond reasonable doubt. It certainly contains

no words expressly repealing any former statute, either in whole or in part. And there is no necessary implication of intentional repeal. Implied repeals are not favored. 2 Dwarris on Statutes, 638, 673. The rule is that an ancient statute will be impliedly repealed by a later one only when the later is couched in negative terms, or when the matter is so clearly repugnant that it necessarily implies a negative. Where both acts are affirmative, and the substance such that both may stand together, both are held to be in force. *Foster's Case*, 11 Rep. 57. Now, the act of 1855 does not declare that any claim against the United States shall be assignable. At most, it suggests that claims which are assignable may be sued in the Court of Claims in the name of the assignee, without undertaking to declare what claims may be assigned. That there may be such claims is clearly stated in the act of 1853, and there are devolutions of title by force of law, without any act of parties, or involuntary assignments, compelled by law, which may have been in view. There is, therefore, no necessary inconsistency between the two acts. Besides, they relate to different subjects, and it may be doubted whether a statute relating to one subject can be construed to repeal by implication a prior statute relating entirely to another subject.

We think, therefore, the act of 1853 is of universal application, and covers all claims against the United States in every tribunal in which they may be asserted. And such, we think, was the understanding of Congress when the Revised Statutes were enacted. In the revision, the act of 1853 was included and re-enacted. Sect. 3477. In 1873 and 1874, therefore, it was not thought that the act establishing the Court of Claims had repealed any of the provisions of the act of 1853; for, if it had been, the repealed parts would not have been included in the revision. The Revised Statutes were passed June 22, 1874. The decisions of the Court of Claims, that the act of 1853 did apply to claims made in that court, had been made years before, and reported, and they may be presumed to have been within the knowledge of Congress. The later decisions in *Lawrence's Case* and *Cavender's Case* were not reported until 1874, and were probably not known, or not as well known. By re-enacting the statute of 1853, without change, it is a

reasonable presumption Congress intended what it was known the court had adopted as its true construction.

If we are right in the opinion we have expressed, that claims against the United States cannot be assigned so as to enable the assignee to bring suit in his own name in the Court of Claims, it is enough for the present case. But there is another reason why claims for the proceeds of captured and abandoned property cannot be assigned so as to give the assignee a standing in that court. It is found in the act giving the court jurisdiction of such claims. Not every person is permitted to sue for such proceeds. The act declares that " any person claiming to have been the owner of any such abandoned or captured property may, at any time within two years after the suppression of the rebellion, prefer his claim to the proceeds thereof in the Court of Claims, and on proof to the satisfaction of the court of his ownership of said property, &c., receive the residue of such proceeds. It is thus plain that only he who can claim as an owner of the property captured or abandoned, and who can prove such ownership, is permitted to sue and recover. The assignee of a claim for the proceeds is not such an owner of the property captured. That the ownership claimed and required to be proved is that which existed at the time of the capture, is quite plain. *Carroll* v. *United States*, 13 Wall. 151. The owner of that into which the property has been converted is not necessarily the one who was the owner of the property itself. It is thus evident that Congress did not intend to give any assignee of the proceeds a right to sue for them. And there were very substantial reasons for withholding such a privilege.

*Judgment reversed, and the record remitted with instructions to dismiss the claimant's petition.*

MR. JUSTICE BRADLEY delivered the following opinion, in which MR. JUSTICE FIELD concurred.

I dissent from so much of the opinion in this case as holds that an assignment of a claim against the United States could not transfer the legal title thereto without the aid of some statute. I know of nothing in the Constitution or laws of the United States which adopts the common-law rule on this sub-

ject.   There is no such rule in the civil law, nor in the laws of many of the States.   So far as the opinion places the judgment upon the statute of 1853, which prohibits the assignment of claims against the United States, I concur in it.