## FARMERS STATE BANK OF RIVERTON v. RIVERTON CONST. CO.

(No. 1423; October 16, 1928, 270 Pac. 1082)
(Rehearing Denied March 12, 1929)

*F. Chatterton, Kinkead & Ellery* and *H. Donzelman,* for appellant.

240

*O. N. Gibson* and *A. C. Allen,* for respondent.

242

METZ, District Judge.

This case is in the Supreme Court on petition in error and is the outgrowth of a seven-cornered law suit tried in the District Court of Fremont County in 1925. The pleadings are exceptionally voluminous, occupy two hundred pages of Volume 1 of the record on appeal, and each party in the case filed numerous amended pleadings, answering and replying to each other's charges and counter-charges. We will not attempt to analyze all these pleadings. This opinion would become entirely too extended. Suffice it to say, the real contentions of the parties are as follows:

The plaintiff bank sued the Riverton Construction Company to recover upon three promissory notes executed and delivered by the construction company to the bank for large sums of money borrowed from the bank to carry on their operations as general contractors. Two of these notes were for $5,000 each and the third for approximately $7,500. The $7,500 note was endorsed by J. A. Delfelder, N. G. Petry, W. J. McLaughlin and E. H. McLaughlin. Plaintiff also sued on a $10,000 guaranty signed by J. A. Delfelder, E. H. McLaughlin and N. G. Petry. There was a half-hearted attempt on the part of the defendant, construction company and endorsers of the notes to defend against the bank's claim, but the trial court did not think the defense sufficient and we quite agree with the lower court on that much of the case.

Plaintiff bank also alleged that Harry B. Henderson, trustee, had in his possession certain moneys assigned and transferred to him in trust by the construction company

and Petry, and claimed that it was to be applied on the construction company's and Petry's indebtedness to the bank. Henderson was made a party because of his holding certain of the funds in trust. There was no attachment or other proceeding instituted against Henderson, or the funds in his possession. The action against the defendants Petry, W. J. McLaughlin, and the Executrix of the Delfelder estate was based upon the alleged guaranty by the defendants of the notes set forth in the plaintiff's petition.

During the trial the plaintiff dismissed its second cause of action, which included one of the $5,000 notes sued upon.

M. F. Brothers was permitted to interplead in the case because he claimed he was entitled to the funds in the hands of Henderson as trustee, because of the construction company entering into a contract with the government for the construction of a certain bridge on what is known as the Buffalo Fork of the Snake River, and that Petry had been employed to construct the bridge and furnish the material, and that the construction company was to collect the money from the government and pay all the money to Petry except $1,000 which was to be retained by the construction company from the final payment and estimate, and that subsequent to Petry's entering into the contract with the construction company to build the bridge for them and before Petry commenced any work on the bridge or furnished any material therefor, that he, Brothers, entered into an agreement with Petry covering their joint construction of the bridge, and that it developed that Petry was unable to furnish his share of the expenses and capital necessary to construct the bridge and it was then orally agreed between Petry and Brothers that Brothers would proceed with the construction of the bridge and with his own money and that to be paid by the government to the construction company, and that in consideration of his doing that he was to re-

ceive $10 per day for his work on the bridge and to be reimbursed for all moneys furnished and expenses incurred by him, and in addition thereto he was to receive one-half of all net profits growing out of the contract for the construction of the bridge. Brothers further alleges in his amended and substituted answer that the construction company and Petry entered into a trust agreement subsequent to the construction of the bridge, whereby all moneys which the construction company then had on hand and all other moneys to be paid in the future by the government to the construction company on the bridge contract were assigned and transferred to Harry B. Henderson as trustee, to be held by him pending the settlement of certain controversies and disputes between the construction company and Petry, and the money held by the trustee was to be paid out by the trustee to the person designated by the judgment of a court of record, etc. That on the 18th of February, 1921, Petry sold and assigned to Brothers all moneys due or to become due him under the contracts referred to in the trust agreement; that $2,682.77 had been paid to the trustee pursuant to this trust agreement; that the last payment made by the government on the bridge contract in the sum of $3,-293.48 was paid to the construction company and the construction company failed and refused to pay the same to the trustee pursuant to the trust agreement.

The plaintiff bank and defendant construction company filed practically identical replies, in which the plaintiff and the construction company alleged an open running account between Petry and the construction company from January 1, 1920 to April 20, 1921, on which account it is alleged that Petry is indebted to the construction company in the sum of $3,547.12. The reply of plaintiff, filed on May 11, 1922, alleges that the $3,293.48 was not paid to the trustee and that the trustee had never been entitled to the possession of that money. It is also alleged that Petry is not entitled to the money held by the

trustee. Brothers then filed an amended reply containing a general denial and also pleaded estoppel. We do not deem it necessary in the present case to go into the question of estoppel and will not discuss it, notwithstanding his contention in that respect may be well taken.

The defendant Chatterton, Riverton Construction Company, and the Executrix of the Delfelder estate replied to the amended and substituted answer of Brothers and alleged that the trust agreement was enterd into between Petry and the Riverton Construction Company in which Harry B. Henderson was appointed trustee, and alleged that Petry was indebted to the construction company upon open account on the books of the company in the sum of $4,648.14; that on the 20th of April, 1921, final payment of $3,293.48 by the United States government on the Buffalo Fork bridge contract was made to the Riverton Construction Company, and by the construction company credited to the account of N. G. Petry, and that Petry, after said credit, was still indebted to the construction company on open account in the sum of $1,354.66. The company further alleged that of the $2,682.77 in the hands of Harry B. Henderson, trustee, they were entitled to $1,000 due them on the Buffalo Fork bridge contract and the balance should be awarded to the construction company in payment of the indebtedness of Petry to the company. The construction company further alleges it had no notice of the agreement or co-partnership between Petry and Brothers, alleged that Brothers was present at the time the trust agreement was entered into between Petry and the Riverton Construction Company and was advised as to the nature and purpose of the agreement, and it alleged that Brothers was estopped from claiming any interest in the money in the trustee's hands.

From reading the foregoing it will appear that Brothers claims that he is entitled to all the money received by the construction company and the trustee from the gov-

ernment, on the Buffalo Fork bridge contract. Only the bank, the construction company and Brothers are actually interested in the trust fund and the money received from the Buffalo Fork bridge contract. Brothers claims he was entitled to the fund by virtue of the assignments by Petry to him. The bank contends it is entitled to the money in the trustee's hands because the construction company owes the bank a large sum and Petry's endorsement of the indebtedness. The construction company contends that it is entitled to the fund in the trustee's hands because Petry is indebted to it upon an open account in a sum far in excess of the trust funds. The real issue, then, between the bank and the construction company on the one hand, and the intervener Brothers on the other, seems to be whether or not Petry was indebted to the construction company on an open account in a sum in excess of the amount in the hands of the trustee, or which should have been in his hands under the trust agreement made between Petry and the construction company, and also the question of whether or not the assignments from Petry to Brothers are valid as against the bank and the construction company. Practically the entire record is taken up with the evidence and proceedings introduced on both sides and by all parties interested, concerning these two questions. The bank and construction company charged Petry with what they termed an ''open account,'' which we do not think can be so classified, and attempted to prove poor judgment and negligence in making the advances.

The pleadings were largely ignored by the litigants during the trial, and no objections made of any consequence. Thus the bars were let down and everything went into the record.

Judgment was finally entered by the lower court generally in favor of the plaintiff and against all the defendants and the intervener, Brothers.

The court found in favor of Chatterton as against the intervener Brothers and entered judgment against the construction Company, Petry, and the Delfelder estate in the sum of $4703.00 on the first cause of action and against the construction company, Petry and W. J. McLaughlin and the Delfelder estate for $6268 on the third cause of action, and directed the trustee Henderson to pay $2687.77 to the plaintiff to be applied on the judgment debts aforesaid; also established the claim against the Delfelder estate of $10,078.91. This judgment was dated April 6, 1926.

The appeal by the executrix of the Delfelder estate was disposed of by this court in the case of Delfelder, et al. v. Bank, (Wyo.) 269 Pac. 418, and we need not consider the Delfelder appeal in this opinion.

We have carefully considered the evidence in this case, and from the pleadings and evidence we are satisfied that the following facts exist: That the Riverton Construction Company was organized in May, 1919, for the purpose of entering into general contracting of road and highway construction work in the northwestern part of the state; that a number of road and bridge contracts were secured from the State of Wyoming and the United States government. J. A. Delfelder was president and director of the company from its organization in May, 1919, to the time of his death in March, 1921. W. J. McLaughlin was vice president and director from the company's organization to October 30, 1920, at which time he resigned. N. G. Petry was director and general manager of the company and in active charge of its operations from the date of its organization to June 1, 1920, and he was also secretary and treasurer of the corporation and resident agent from February 5, 1920 to September 25, 1920. On June 1, 1920, he left the company as general manager but stayed on the board of directors. Fenimore Chatterton was director and secretary and treasurer of the company from its organization to February 5, 1920, at which time he resigned as secretary and treasurer only. On September 25, 1920, he became general manager,

and was also authorized to look after the company's legal business, which position he held to the time of trial. P. J. Kane was a director from the organization of the company to the time of the trial; Joe Marcus was elected vice president and director October 30, 1920, to fill the vacancy caused by W. J. McLaughlin's resignation of that date. D. B. Miller was general manager and in active charge of construction work and the affairs of the company from the time Petry resigned as general manager on June 1, 1920, to the middle of September, 1920. Vant Huston was the bookkeeper for the company from the time of its organization in 1919 to the last of November, 1920, with the exception of two or three months when he was absent looking after the company's store in the mountains. The construction company borrowed large sums of money from the bank, evidenced by notes. The government bridge contract was dated June 8, 1920. The Fetry and construction company contract in relation to the government bridge at Buffalo Fork was dated July 15, 1920. Petry assigned half interest in his bridge contract with the construction company to Brothers on July 19, 1920. The bridge was completed by Brothers November 24, 1920. This present litigation started January 9, 1921. The trust agreement was entered into between Petry and the Riverton Construction Company at Denver, February 14, 1921. Petry assigned to Brothers the balance of his interest in the funds from this bridge contract February 18, 1921. Brothers intervened in this litigation April 30, 1921. The government paid the final estimate of $3293 on the bridge contract to the Riverton Construction Company about April 20, 1921. The Riverton Construction Company paid $3293.48 to the Farmers State Bank to apply on the notes about April 25, 1921. Chatterton for the construction company paid about $740.00 to Henderson as trustee and the State Highway Department paid approximately $1900 to the trustee, under the terms of the trust agreement.

We will first dispose of the claim of the construction company that Petry was indebted to the construction company. Petry, while secretary and treasurer and general manager, apparently was busy looking after the different contracts that the company had for building roads in Fremont County, and during that time a number of sub-contracts were entered into with different men to construct highways and roads, and Petry made extensive advancements to these subcontractors for the purpose of assisting them to secure materials, labor, supplies, horses, machinery, and dozens of other items to comply with their contracts and complete their road work. These advances and payments to subcontractors and others engaged in the work were made between January 1, 1920 and April 20, 1921, and amounted to approximately $37,000. The gross amount of the contracts does not clearly appear in the record. Petry had been a general contractor for some sixteen years, and testified that it was necessary to make the advances to the subcontractors for the reason that a subcontractor, as a general rule, had no capital and but few teams and little equipment, and it was necessary to bring them to the work; that it was necessary to furnish them with supplies and buy feed for their horses and pay freight on their equipment. There does not seem to be any contention but that Petry had authority to make advances and pay bills. Petry testified that none of the officers objected to any of the advances, and in connection with the advances testified:

"It is customary to make advances to subcontractors. It is done by all general contractors. During my time as manager of this company we probably had twelve or fifteen, maybe more, subcontractors. I think that in each case we made advances. Q. State whether or not any officer of the company ever objected to your following that custom. A. No. Q. Now calling your attention particularly to the Salyer subcontract, who made that contract? A. Mr. McLaughlin, I think. Q. State to the court the manner or method by which advances were made by you as general manager of the company. A. We would buy feed for their

horses, and in some cases, in order to get them on the work, we paid their freight for equipment. We started them out with a control of groceries for their commissary to feed their men and advanced other supplies that they needed in order to commence their work. Q. Did you have an active board of directors during that time you were general manager? A. Yes. Q. Who took active interest in the construction company? A. Why, at the beginning they all did. Q. Who were they? A. Mr. Delfelder, Mr. McLaughlin, Mr. Chatterton, Mr. Kane and myself. Q. Did you have meetings with these directors? A. Yes. Q. Formal or informal? A. Yes, both. Q. At those meetings, state whether or not there were any discussions as to the method in which you were managing the business of the company. A. Yes, that was discussed. Q. State whether or not the question of advances to subcontractors arose? A. Yes, that did. Q. State whether or not you advised the board of directors as to the advances made and as to your custom. A. Yes, sir, they knew about it. Q. State whether or not any objection was made. A. Never any. Q. State the first time you learned that the company claimed that these advances should not have been made. A. At the beginning of this trial.''

Mr. W. J. McLaughlin, the vice president of the company, testified that he had had thirty-four years experience as a general contractor, in building railroad grades, ditches, dams, etc., and he had dealt with lots of subcontractors, and that he took active part in the construction company's business during the early part of its organization and knew that Petry made advances to the subcontractors, and that it was necessary to make advances to subcontractors; ''they couldn't carry on without it.'' Miller, who was the general manager for the construction company from about June 1, 1920, to the middle of September, and who succeeded Petry, testified that he had an audit prepared by a bookkeeper, Stultz, and gave a copy of the audit to Delfelder and McLaughlin, and that Delfelder and McLaughlin conferred in the company offices concerning the audit, and went over the audit together. This audit calls particular attention to the Salyer and Penton accounts, and it is the large number of

items in these accounts that Chatterton, when he became general manager, had charged, in the middle of November, back to Petry, and on which the company now claims Petry is indebted to them. McLaughlin testified that "Petry would consider things with us, Chatterton, Delfelder, or someone decide things with him, whether we better do it or not do it." Miller testified that when he was general manager following Petry, that he made advances to the subcontractor; that it was necessary to see that they got hay and grain, etc.; that it was everyday practice. Huston, who was the bookkeeper, testified that he made the charges on the books on November 15, 1920, against Petry, on the direction of Chatterton; original charges were made on the books in 1919 and 1920, and that he did not send Petry any notice of the books being changed, and Petry being charged with different items making up the sum total in controversy here.

The evidence further discloses that Salyer had had three subcontracts with the construction company. The first contract was very satisfactory and Salyer made money. It is a singular thing in this litigation that the evidence disclosed that Chatterton is the only one of the board of directors or officers who ever raised any question about Petry's advances to the subcontractors, and that he never raised any question about it until the middle of November, 1920, when he directed the bookkeeper to change the books and charge Petry with a great number of the items paid by Petry on the Salyer and Penton work. The testimony of McLaughlin, Miller, Petry and Huston stand without any material contradiction and even Chatterton, the construction company's main witness, did not deny their evidence. Miller testified that when he came on the job he talked the Salyer account over with Mr. Delfelder and Mr. McLaughlin and they made a rough check, and there would have been a very close balance if Salyer had not pulled away from the job, but when he left the job of course there was no chance for it to pay out. That Salyer left the job after Petry quit as gen-

eral manager. Brothers testified that when he came back from the finishing of the Buffalo Fork bridge, the last of October, 1920, he had a talk with Delfelder; Delfelder gave him a letter to Marcus in reference to Brothers' claim for the money on this bridge contract; that he presented the letter to Marcus, Marcus read the letter: "Marcus said that he would settle with me. He said 'With this letter from Mr. Delfelder I want to go talk to Chatterton; take the letter to Chatterton and I will meet you at the Teton Hotel at eleven o'clock;' he says, 'While I am vice president of the company I have authority to act on things, you know. If Chatterton don't pay you I will take it out of his hands and pay you myself.' "

Chatterton testified that Petry evidently thought he had a right to advance the money; that he had no right to advance the money to Salyer without security, and that Petry showed poor judgment in not getting security, and that he appropriated money to Salyer he had no right to.

The evidence disclosed that after the audit was submitted to the directors by Miller and this audit disclosed that the company owed Petry some $800, Petry asked for his money and Miller and McLaughlin discussed the situation and paid Petry $500. That shortly after this Brothers talked to Miller and asked what Petry's standing was with the company and Miller informed him that the books showed that the company owed Petry about $800 and that he had paid Petry part of that money. The evidence further discloses that at no time did Delfelder or McLaughlin or any of the directors of the company object to any of the advances made by Petry and in fact the evidence discloses that large sums of money borrowed from the bank during this time undoubtedly must have been used to help finance these advances. That there was evidently no question raised about Petry's advances by any of the directors or officers and the first that is heard about the matter is when Chatterton, after he became general manager, decided that he would charge Petry with part of the advances made on

the Salyer and Penton contracts. The evidence discloses that Delfelder, the president, and McLaughlin and Marcus, in their conversations with Brothers, all felt that he should be paid the money that was due him. It strikes us as strange indeed that if Petry did not have authority to make advances, or that his advances were too extensive, or that he was using poor judgment, Delfelder, Marcus, McLaughlin, Kane, or even Chatterton, would have said something about it or made some objection. These officers undoubtedly knew what was going on. They were borrowing money at the bank to pay for these operations. The matter was being discussed between them, and the mere fact that the Salyer account did not pay out is not in our minds sufficient justification for Chatterton to change the books and charge Petry back with the sum of several thousand dollars advanced by him as general manager on these accounts. Chatterton said that he did not transfer any of the Petry account that was not evidenced by the check; that he had paid the moneys out as an advance to Salyer when Salyer was in debt to the company, and that there was no prospect of his ever getting out of debt on his contract with the company, and he did not charge any to Petry's account for which he felt that the company might lawfully be held liable. An examination of the list of advances claimed to be unauthorized shows that advances were made to Salyer to buy horses, payments to feed companies and for oats, blacksmith shop bills, hay, groceries, freight on wagons, demurrage on hay, some labor bills, etc. All of these accounts undoubtedly were in connection with the carrying on of the contracts with the construction company and subcontracted by Salyer and Penton and others. We do not feel that under the evidence in this case Chatterton was justified in charging Petry with these advances made by Petry while general manager. True it is that the company was unfortunate on some of its contracts. There is no attempt or indication that any of the advances by Petry were for his own use and no charge of misappropriation;

in fact the evidence indicates that the contention of the construction company is that Petry used poor judgment. We are not prepared to say whether he did or not. McLaughlin and Miller both testified that they would not give an opinion as to whether he used poor judgment or not, or whether his advances were excessive, without first knowing all the particulars and circumstances connected with the work contracted for, etc. We draw from the evidence in the case that the main reason for the construction company charging Petry back with these advances is because Chatterton thought they were excessive, and that Petry used poor judgment.

We next come to the question of whether or not Brothers is entitled to Petry's interest in the Buffalo Fork bridge contract and the funds received from the government on account of said contract. The evidence discloses that Petry resigned about June 1, 1920, as general manager; that the construction company entered into a contract with the government for the Buffalo Fork bridge June 8, 1920; that Petry went to McLaughlin in the middle of July and in a talk with McLaughlin explained to him he would like to secure a subcontract on the Buffalo Fork bridge, but that he did not have sufficient funds to handle the job, but he thought he could get Brothers to go in with him. McLaughlin told him at that time if Brothers went in with him they would contract him, meaning Petry. McLaughlin, on the 15th of July, directed Miller to prepare the contract for Petry on the Buffalo Fork bridge. Miller prepared the contract and McLaughlin signed it as vice-president. A few days thereafter Brothers met Miller on the street near the Teton Hotel in Riverton and asked Miller how Petry stood with the construction company, and at that time Miller told him that the books showed the company owed Petry about $800, of which amount they had paid $500 or thereabouts. Brothers then made his deal with Petry and started for the work at Buffalo Fork. Petry followed the next day

and delivered to Brothers at Dubois his assignment of a half interest in the contract that he, Petry, had entered into with the construction company for the construction of the bridge. Petry's finances became low and Brothers, because of the fact that they were not securing their money as fast as they needed it, entered into an oral agreement with Petry in reference to taking over the balance of the contract and carrying it through and getting paid wages and then paying Petry. This oral contract is somewhat indefinite. The evidence is not satisfactory on it. ''However, Brothers completed the Buffalo Fork bridge on about the 24th of November and came to Riverton, asked for his money, and he and Chatterton had a meeting in Cromer's office in Riverton. Chatterton, as an officer of the company, had money paid to the company by the government on account of the Buffalo Fork bridge contract. Chatterton paid to Brothers some $2,-400 that Brothers had advanced on labor.'' Brothers came on to Denver, had a talk with Delfelder, then the matter drifted along until February, 1921, after this suit was started. Chatterton and Petry were in a dispute over the alleged book account. They came to Denver and there Petry and the construction company entered into a trust agreement whereby the funds and money to be received from the bridge contract from the government was to be paid to Harry B. Henderson as trustee to be held by him. Brothers was present and knew of the preparation of this trust agreement, which is dated February 14, 1921. Chatterton turned over to the trustee $740 out of this bridge account, the highway department paid some $1,900 to the trustee, and on the 18th of February, Petry assigned to Brothers the balance of his interest in this subcontract and also all money he might have coming on account of the Buffalo Fork bridge contract. Brothers and Petry figured up their respective positions as to how much each had coming and it was found Petry had $444.75 coming on his

half, and Brothers paid him that amount and Petry then gave him the last assignment, February 18, 1921, for the balance of his interest in the Buffalo Fork bridge contract payments.

Along in April, 1921, the government paid the final estimate on the bridge contract, sent the money to the construction company, some $3,200 odd; Chatterton took the money and instead of paying it to the trustee as agreed upon between the construction company and Petry in their trust agreement, he paid it on behalf of the construction company to the plaintiff bank to be applied upon the notes of the defendants sued upon. The only justification that he gives for his acts in making this payment is that the government refused to recognize the trust agreement, and had sent it to the construction company and he thought it should be paid to the bank, as Petry was on the notes.

Under the law and the evidence in this case we see no reason why the assignment by Petry to Brothers is not legal. Certainly Petry had a right to assign his interest in the money to be derived from these contracts, as the money was not tied up with any attachment, Brothers had done a great deal of work and advanced a great deal of money; in fact, had practically handled all of the Buffalo Fork construction work; and had paid a valuable consideration for it.

Counsel for the construction company and the bank contend that Brothers is not entitled to any amount for the reason that the contract between Petry and the construction company is null and void, under U. S. Stat. Sec. 3477 (U. S. Code Ann., Title 31, Sec. 203.) We cannot agree with counsel on their contention. First, we are not convinced that the contract between Petry and the construction company was an assignment. Second, even if it is an assignment, we do not see in what manner the government would be interested or concerned. The bridge

was built by Brothers and Petry, accepted and paid for by the government, and while some of the earlier authorities indicate that an assignment of a claim against the government would be void, nevertheless, from an examination of the later authorities, not only of the state Supreme Courts, but of the United States Supreme Court, we are of the opinion that this contract would not be void on the grounds contended for by counsel.

In the case of Lay, et al. v. Lay, et al., 118 Miss. 549, 79 So. 291, the Supreme Court of Mississippi in 1918, passing on this question, said:

"The primary object of this statute was to prevent fraud against the United States and the government can always rely upon the statute in any case where it is directly interested. Here the government has allowed the claim, made an appropriation therefor and fully paid the judgment rendered by the court of claims. The funds are now under the jurisdiction of our state court, and the equitable and legal rights of the parties must govern."

Again, in Fewell v. American Surety Co., 80 Miss. 782, 28 So. 755, 92 Am. St. Rep. 625, the court says:

"The United States is not interested in this litigation. The contract was fully executed so far as the government is concerned." Citing a great many cases.

In the case of McGowan v. Parish, 237 U. S. 285, 35 Sup. Ct. 543, 59 L. Ed. 955, the Supreme Court of the United States, in passing on this question in 1914 has to say:

"As to the effect of Section 3477, Rev. Statutes, it has been several times declared by this court that the statute was intended solely for the protection of the government and its officers during the adjustment of claims and that after allowance the protection may be invoked or waived as they in their judgment deem proper."

Again the United States Supreme Court, in the case of Lay v. Lay, 248 U. S. 24, 39 Sup. Ct. Rep. 13, 63 L. Ed. 103, on appeal to the United States Supreme Court from Mississippi, in affirming the Mississippi case heretofore cited, states that Rev. St., Sec. 3477 does not prohibit a claimant from assigning a claim against the United States; specifically affirms the Lay case in Mississippi and cites the McGowan-Parish case, supra. We do not see why anyone but the parties here can be in any manner interested or have any rights in the bridge contract.

Nor do we see why the bank was not entitled legally to take the money paid to them on the notes by the construction company. The bank was not a party to the trust agreement. True, the construction company violated its trust agreement with Petry, but that does not make the bank responsible. We feel that Brothers has a good and valid assignment from Petry of all of Petry's interest in these contracts, and that he is entitled to the money being held by the trustee, and that the trustee should pay this money to Brothers.

From what has been said we feel the judgment of the District Court should be affirmed wherein the plaintiff bank is given judgment against the construction company and all the defendants excepting Delfelder and Brothers. The judgment herein should accordingly be modified to the extent that Harry B. Henderson, trustee, be required to pay over to M. F. Brothers, intervener, all money in his hands held under the trust agreement above mentioned, and that M. F. Brothers have judgment against the Riverton Construction Company in the sum of $2,293.48, being the last payment on the final estimate made by the United States government less $1,000, which, under the contract with Petry, was to be retained by the Riverton Construction Company; said judgment to be as of date

of April 20, 1921. In all other respects the judgment should be affirmed and it is so ordered.

*Modified and Affirmed.*

BLUME, Ch. J., and RINER, J., concur.

ON PETITION FOR REHEARING

METZ, District Judge.

Counsel, in the petition for rehearing, allege that our former opinion in this case is in irreconcilable conflict with a number of decisions of this court, and cite Edwards v. Wilson, 30 Wyo. 275; Conway v. Smith Mercantile Co., 6 Wyo. 468; Patterson v. Hardware Co., 7 Wyo. 401; Columbia Mining Co. v. Duchess Mining Co., 13 Wyo. 244; Phalen v. Cheyenne Brick Co., 26 Wyo. 495; Lellman v. Mills, 15 Wyo. 152; and Farmers State Bank v. Northern Trust Co., (Wyo.) 270 Pac. 163.

All of the above decisions hold, directly or in effect, that a judgment of the lower court will not be disturbed if there is sufficient evidence to sustain the same. We agree with these former decisions, but do not agree with counsel in his contention that there is sufficient evidence to sustain that portion of the judgment that we modified in the former decision.

We gave this case our undivided attention for a considerable length of time and carefully read the entire voluminous record and extensive briefs, and over 250 pages of pleadings, and again we have gone over this same ground and feel now, as then, on the questions involved in this litigation.

We devoted considerable space to discussing the evidence in our former opinion; in fact, we went into considerable detail, and we shall not encumber this opinion with another discourse on that subject.

Counsel for plaintiff further contend that the decision in this case is in irreconcilable conflict with the following Fed-

eral decisions: Spofford v. Kirk, 97 U. S. 484, 24 L. Ed. 1032; National Bank of Commerce v. Downey, 218 U. S. 345, 31 Sup. Ct. 89, 54 U. S. (L. Ed.) 1065, 161 Fed. 839; in re Rudford Co., 257 Fed. 722; Indemnity Co. v. Endres, 290 Fed. 98; Hall v. Chandler, 289 Fed. 675; Lindborg v. Humphrey, 280 Fed. 901; In re Waters-Colver Co., 206 Fed. 845; McGowan v. Parish, 35 Sup. Ct. 543.

Counsel for the plaintiff further contends that the Petry contracts and agreements affecting the funds derived from the bridge contract with the Government are absolutely void under the above authorities.

The above authorities construe Section 3477 of the Revised Statutes of the United States, and are not in point under the facts and pleadings in this case.

An examination of the authorities above cited by counsel and the authorities hereinafter cited will disclose that most of these authorities and decisions can be classified in one of three groups:

1. Cases where an assignee of a claim has brought suit against the Government to recover on his assignment; United States v. Gillis, 95 U. S. 407-417, 24 L. Ed. 503; St. Paul & Duluth R. R. Co. v. United States, 112 U. S. 733, 5 Sup. Ct. 366, 28 L. Ed. 861; Hager v. Swayne, 149 U. S. 242, 37 L. Ed. 719.

2. Cases where there has been an assignment by the operation of law, such as assignments in bankruptcy and claims passing to heirs and devisees of deceased, etc.; Erwin v. United States, 97 U. S. 392, 24 L. Ed. 503; Seaboard Air Line v. United States, 256 U. S. 655, 65 L. Ed. 1149; Hobbs, Assignee v. McLean, 117 U. S. 567, 29 L. Ed. 940; Goodman v. Niblack, 102 U. S. 556, 26 L. Ed. 229; Butler v. Goreley, 146 U. S. 303, 36 L. Ed. 981; Price v. Forrest, 173 U. S. 410, 43 L. Ed. 749; National Bank of Commerce v. Downie, 218 U. S. 345, 54 L. Ed. 1065.

3. A miscellaneous group of authorities where the facts are such that they cannot be classified in either of the two

beforementioned major groups: Bailey v. United States, 109 U. S. 484, 24 L. Ed. 1032; Nutt v. Knut, 200 U. S. 13, 50 L. Ed. 348.

The case at bar is quite peculiar in some respects.

A significant fact in this case is the total lack of an attempt by anyone to avoid or qualify the Buffalo Fork bridge contract of employment between the construction company and Petry. The parties, by their pleadings in the lower court, all allege that it was simply an employment contract. There is no claim by anyone that it was an assignment, and the construction company and Chatterton were the most emphatic in their pleadings on that score.

The contract between Petry and the construction company for employment on the Buffalo Fork bridge provides in part as follows: "That for and in consideration of the premises, and the payment of the sum of $1,000, to be made in the manner hereinafter provided for, first party is employed and does hereby employ second party to do and perform all of the work and labor and to furnish and supply all of the materials and other things required for the said construction hereinabove more specifically mentioned," etc. It is expressly provided in the contract that the construction company shall collect and receive the moneys from the Government.

The pleadings of plaintiff bank and defendant Construction Company show, all the way through the record, that the main dispute throughout the trial was over an alleged open running account claimed by the Construction Company against Petry.

The Construction Company, in effect, ratified the bridge contract with Petry at numerous times, and as late as February 23, 1923, nearly two years after the last money was paid to the Construction Company by the Government on the bridge contract, the Construction Company set up in its pleadings and alleges affirmatively:

That Petry was employed personally, to do and perform all the work and labor and to furnish and supply all of the materials and other things to be done in the construction of the bridge over the Buffalo Fork, etc. That such employment was a personal employment of the said N. G. Petry, which could not lawfully be by him assigned or delegated to another, etc. That the so-called contract referred to (being the Construction Company-Petry bridge contract) shows upon its face that it is simply a memorandum of a personal employment of the said N. G. Petry, etc.; that Article 13 of said agreement between said Riverton Construction Company and the said United States of America, for the construction of said bridge, provided that, ''neither this contract nor any interest therein, shall be transferred or assigned by the contractor to any other person or persons; any such transfer or assignment shall cause the annulment of the contract so far as the United States is concerned.'' All of which was well known to said N. G. Petry at the time of his said employment, and said defendants further allege that his said employment did not in any manner constitute him an assignee of said contract or of any interest therein or to receive the consideration for the construction of said bridge from the United States of America. That said defendants allege that during the time of the construction of the said bridge said Riverton Construction Company received partial payments for materials furnished and labor performed upon said bridge, etc. That thereafter, a difference having arisen between N. G. Petry and the Riverton Construction Company relative to the disposition of certain payments remaining due said Riverton Construction Company, on account of the construction of said bridge, said Petry and Riverton Construction Company entered into a stipulation (being the trust agreement between Petry and the Construction Company) etc. That on the 14th of February, 1921, Petry was indebted to the Riverton Construction Company upon an open account on the books of said company in the sum of $4648; that thereafter, on the 20th day of April, 1921, final payment of the sum of $3293 by the United States on account of the construction of said bridge, was made to the Riverton Construction Company and by it credited to the said N. G. Petry upon said account, and that said N. G. Petry at the time of filing its reply, is justly indebted to the Riverton Construction Company upon said open account in the sum of $1354.

An examination of the record in this case soon convinces anyone that the plaintiff and the construction company have worked in perfect harmony throughout this litigation, and apparently there has been no friction between Petry and Brothers, and the litigants soon formed into two groups as a natural outcome of the litigation.

In the District Court, the plaintiff bank and construction company claimed:

The contract with Petry to build the bridge was legal and that he should receive all the moneys for the work, etc.; that the Government had accepted the bridge and paid for it, and the Construction Company had paid it all to Petry, with one exception, by giving him credit on the account, and that there was no assignment of the contract or interest in it, but just a contract of employment.

But lo and behold, when they get up here in this court, this simple little employment contract blossoms into an unlawful thing of no force and effect, an assignment and contract absolutely void.

In our former opinion we said: "We are not convinced that the contract between Petry and the construction company was an assignment." We say now we are convinced that it is not an assignment of a claim against the United States.

Counsel for the plaintiff may contend that, if it is not an assignment, it is a contract which would be illegal under Section 3477 of the United States statutes. And further, that it is void. We cannot agree with that contention either. Of course Petry could not have enforced any of its terms against the Government, but as we have said before in our former opinion the Government was not in any manner interested in this contract of employment. The Government accepted the work, paid the Construction Company in full for it, and the Construction Company ratified the contract after receiving the money from the Government, by crediting Petry with the money

on the alleged book account and then plead the validity of the contract in this case, not to mention the recognition of the contract, apparently, by placing the $740 in the trustee's hands, according to the trust agreement, awaiting the outcome of the accounting with Petry on the open running account.

Never was there a claim or intimation that Petry's employment contract was not good. The main dispute was whether the Construction Company could credit Petry with the money on the alleged book account. The Construction Company maintained throughout the trial that Petry was entitled to the money and not Brothers. If the plaintiff and Construction Company could accomplish their desires in that respect, then they could credit Petry's alleged debt due the Construction Company, then the Construction Company could pay it into the plaintiff bank on the notes of the Construction Company that were endorsed or guaranteed by Petry, thus in effect paying two accounts with one sum.

We cannot agree with counsel that Brother's assignment from Petry was bogus or invalid, and surely, the assignment given at Denver shortly after the trust agreement between Petry and the Construction Company was made was not void and subject to attack.

Brothers paid Petry the balance due him under their agreement and took the assignment from Petry of whatever was due him under the bridge employment contract, and at that time the Construction Company, through Chatterton, had $742 in the bank, in a special account, which had been received from the Government on this contract.

True, there was a dispute about this alleged book account between Petry and the Construction Company. But, as mentioned before, that would not prohibit Petry from making a valid assignment of the money due him to whomsoever he might choose.

Counsel further contend in their brief that Petry was a trustee for the moneys of the Riverton Construction Company and that the burden was upon him, as trustee, to make a proper and satisfactory accounting for the funds coming into his hands.

We do not, under the evidence in this case, believe that the doctrine contended for applies in this case, and even if it did, we think it has been fully met, as already shown in our former opinion.

So we say again, the evidence in the case was insufficent to sustain counsel's contention, and the Federal decisions are not in point, and Section 3477, United States Revised Statutes, does not apply, under the facts and pleadings in this case, and the contract between Petry and the Construction Company must still remain a mere contract of employment, notwithstanding counsel's apparent desire at this time to ignore the pleadings in the case.

The petition for rehearing will be denied.

BLUME, Ch. J., and RINER, J., concur.